FILED

July 17 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

04-489

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 252

JOHN and BONNIE LORANG,

      Plaintiffs, Appellants and
      Cross-Appellees,

v.

FORTIS INSURANCE COMPANY,

      Defendant, Appellee and
      Cross-Appellant.

FILED

JUL 17 2008

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

APPEAL FROM:     District Court of the Thirteenth Judicial District,
                    In and For the County of Yellowstone, Cause No. DV 2002-961
                    Honorable G. Todd Baugh, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        L. B. Cozzens, Donald L. Harris, Cozzens, Warren & Harris, PLLP,
        Billings, Montana

    For Appellee:

        James L. Jones, Michelle Sullivan, Holland & Hart, LLP,
        Billings, Montana

                      Submitted on Briefs: May 11, 2005

                                Decided: July 17, 2008

Filed:

_____
                          Clerk

Justice James C. Nelson delivered the Opinion of the Court.

¶1 John and Bonnie Lorang ("Lorangs"), husband and wife, filed suit against their health insurance provider, Fortis Insurance Company ("Fortis"), in the District Court for the Thirteenth Judicial District, Yellowstone County. The Lorangs alleged breach of the insurance contract by non-performance, breach by anticipatory repudiation, and three violations of the Unfair Trade Practices Act ("UTPA").

¶2 Fortis moved for dismissal, arguing that the District Court lacks subject-matter jurisdiction. The court denied this motion. Additionally, the parties filed cross-motions for summary judgment. In considering these motions, the court first granted partial summary judgment on liability in favor of the Lorangs with respect to their claim that Fortis breached the insurance contract by non-performance. Second, the court granted summary judgment in favor of Fortis on the Lorangs' claim of breach by anticipatory repudiation. Finally, the court granted summary judgment in favor of Fortis on each of the Lorangs' three UTPA claims. The Lorangs filed an appeal with this Court, and Fortis filed a cross-appeal.

¶3 We address the following issues:

¶4 (1) Did the District Court err in concluding that it has subject-matter jurisdiction over this case?

¶5 (2) Did the District Court err in precluding evidence of the parties' prior dealings from consideration on summary judgment?

¶6 (3) Did the District Court err in ruling on the cross-motions for summary judgment regarding the Lorangs' claim for anticipatory breach of contract?

2

¶7     (4) Did the District Court err in ruling on the cross-motions for summary judgment regarding the Lorangs' three UTPA claims?

¶8     We affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶9     The Lorangs, who have been married since 1983, purchased an individual health insurance policy from Fortis in June of 1991.[1] The policy has been in effect continuously since that time. In October of 1992, doctors discovered bone cancer in Bonnie's right leg. Consequently, her leg was amputated above the knee in February of 1993. Thereafter, Bonnie received a prosthetic leg device, for which Fortis provided coverage.

¶10     A prosthetic leg device attaches to an amputee by way of a separate item, a "socket," which must be professionally molded to fit the contours of the amputee's residual limb. An ill-fitting socket can cause sores and infection in the residual limb, as well as a distorted gait pattern and even a loss of ambulation. Thus, because an amputee experiences gradual changes in the volume and shape of his or her residual limb due to atrophy, weight fluctuation, and other factors, it becomes medically necessary to replace the socket on a periodic basis.

¶11     In Bonnie's case, the gradual changes in her residual limb require that she obtain a replacement socket approximately once every two to three years. She has received these replacement sockets from two care providers, Billings Orthopedic, Inc., and Hanger Prosthetics & Orthotics, Inc. Through these care providers, Bonnie has submitted claims

---

[1] At that time, Fortis went under the name of Time Insurance Company. However, for the sake of simplicity, we will refer to the company as Fortis throughout this decision.

3

to Fortis for the cost of her replacement sockets and associated materials and professional service.

¶12 As noted, the Lorangs' insurance policy with Fortis has been in effect continually since 1991. While the policy has changed during that time in some respects through an "upgrade" process which Fortis offered, it is undisputed that the policy has always provided coverage for the cost of medically-necessary replacement sockets, as well as the associated cost of the materials and professional service necessary to mold the socket to fit Bonnie's residual limb and to ensure proper alignment.

¶13 Although Fortis willingly provided coverage for Bonnie's first socket in 1993, when she received her prosthetic leg device, Fortis has repeatedly resisted providing coverage for the cost of Bonnie's medically-necessary replacement sockets. Fortis' conduct in this regard has prompted the Montana State Auditor's Office ("Insurance Commissioner") to intervene on Bonnie's behalf on two occasions. Fortis' conduct also led to a prior lawsuit between the parties, as well as the current action.

¶14 The Insurance Commissioner initially became involved in this case after Bonnie received her first replacement socket in 1994. By July of that year, the natural process of atrophy had caused changes in the volume and shape of Bonnie's residual limb, such that the socket of her prosthesis no longer fit properly. As a result, she developed sores in the distal end of her leg, at points of contact with the socket, and she had difficulty walking with her prosthesis. Accordingly, Dr. Whitney Robinson prescribed a replacement socket. The socket itself cost $2,650.00, while the materials and service necessary to

mold it to Bonnie's leg and assure proper alignment cost $5,420.00, for a total of $8,070.00.

¶15 Bonnie submitted a claim to Fortis requesting coverage for all these costs, together with a letter from her care provider explaining the medical necessity of a replacement socket. Fortis denied the claim and issued a letter stating that the cost of a replacement socket is not covered by the Lorangs' policy. Consequently, Bonnie sent a letter to the Insurance Commissioner, requesting assistance in compelling Fortis to comply with its contractual obligation. The Insurance Commissioner intervened and ultimately sent a letter asking Fortis to honor Bonnie's claim. Fortis complied with this request, issued a letter admitting its obligation to provide coverage, and ultimately rendered payment for Bonnie's incurred expenses.

¶16 By the summer of 1996, Bonnie again experienced changes in the volume and shape of her residual limb, such that the socket of her prosthesis no longer fit properly. Accordingly, Dr. Whitney Robinson prescribed a replacement socket. This time the socket itself cost $2,782.50, while the materials and service necessary to mold it to Bonnie's leg and assure proper alignment cost $9,010.30, for a total of $11,792.80.

¶17 Bonnie submitted a claim to Fortis requesting coverage for all of these costs, together with a letter of medical necessity from Dr. Robinson.[2] Fortis responded with a letter in which it agreed to provide benefits for the cost of the replacement socket itself. However, Fortis also asserted, for the first time, that the Lorangs' policy does not provide

---

[2] With this claim, Bonnie also sought coverage for the cost of replacing one of the permanent components of her prosthesis, the "knee unit," which Fortis denied. However, coverage for that item is not at issue in this case.

coverage for the cost of the materials and service associated with a replacement socket. As noted, these associated costs constituted the bulk of Bonnie's claim.

¶18 Bonnie's care provider, Billings Orthopedic, Inc., then sent a letter reminding Fortis that it had provided coverage for these associated costs which Bonnie incurred in replacing her previous socket. Nonetheless, Fortis maintained that these costs are not covered by the Lorangs' policy. Moreover, Fortis failed to provide payment for the replacement socket itself, despite having acknowledged its obligation to do so. Thus, the Insurance Commissioner intervened again, and sent a letter to Fortis stating, in part, "I respectfully request you process for immediate payment on these incurred expenses." Fortis eventually complied with this request, issued a letter admitting its obligation to provide coverage for the replacement socket as well as the associated costs, and ultimately rendered payment for Bonnie's incurred expenses.

¶19 Previously, in the summer of 1996, Fortis had notified its agents that it would be offering an upgraded version of the "Form 502" medical policy in Montana—the policy under which Bonnie was insured. With this notice, Fortis recommended that Montana insureds should elect the upgrade, which purportedly provided broader coverage at a reduced price. Thus, one of Fortis' local agents, Joan Nelson, talked with Bonnie about the option of upgrading. Given Bonnie's ongoing need for replacement sockets, Mrs. Nelson contacted Fortis' General Agent for Montana, Marie Deonier, to determine whether the upgraded policy would provide the same prosthetics coverage which the Lorangs' policy already provided. Mrs. Deonier recommended that the Lorangs take the opportunity to upgrade, and stated that the upgraded policy would provide coverage for

6

Bonnie's future replacement sockets. Accordingly, the Lorangs elected to upgrade their policy. They notified Fortis of their decision, and the upgrade went into effect in December of 1996. The upgraded policy was thereafter identified as a "Form 100" medical policy, while the Lorangs maintained the same policy number they received in 1991. Nearly two months later, under the circumstances explained above, Fortis issued payment for Bonnie's second replacement socket.

¶20 By October of 1998, Bonnie again experienced changes in the volume and shape of her residual limb, such that the socket of her prosthesis no longer fit properly. Accordingly, Dr. Whitney Robinson prescribed a replacement socket. This time the socket itself cost $2,800.00, while the associated materials and service cost $9,010.30, for a total of $11,810.30.

¶21 Bonnie submitted a claim to Fortis requesting coverage for all of these costs, together with a letter of medical necessity from Dr. Robinson. Fortis responded with a letter in which it denied the claim, stating that the Lorangs' policy does not provide coverage for the cost of replacement sockets. This time, Fortis did not distinguish between the cost of the socket itself and the cost of associated materials and service.

¶22 Consequently, John Lorang sent a letter requesting that Fortis reconsider its denial. Additionally, Fortis' local agent, Joan Nelson, and Fortis' General Agent for Montana, Marie Deonier, also sent letters to Fortis asking for reconsideration. Mrs. Deonier stressed in her letter that a replacement socket was medically necessary. She also stressed that Fortis had previously provided payment for Bonnie's replacement sockets,

7

and stated: "I would also not like to see us have to go to court with this, and if denied again, it would not surprise me if that is the route these people will be forced to take."

¶23 Fortis conducted a review of the claim, but refused to reverse its denial. Fortis then responded with a letter stating that the Lorangs had upgraded to the "Form 100" policy, and further stating that this policy does not provide coverage for the cost of replacement sockets. However, Fortis failed to identify any difference between the prosthetics provisions in the original version of the Lorangs' policy and those in the upgraded version of their policy.

¶24 Marie Deonier then sent another letter urging Fortis to reconsider. Fortis again reviewed the claim, but refused to reverse its denial. Fortis then issued another letter stating that the Lorangs' upgraded policy does not provide coverage for the cost of replacement sockets. Again, Fortis failed to identify any difference between the prosthetics provisions in the original version of the Lorangs' policy and those in the upgraded version of their policy.

¶25 The Lorangs retained an attorney who sent a letter demanding that Fortis acknowledge its obligation and render payment. This letter further stated that the Lorangs would file suit if necessary. Once again, Fortis refused to reverse the denial and issued a letter stating that the Lorangs' upgraded policy does not provide coverage for the cost of replacement sockets.

¶26 The Lorangs sent one more request for reconsideration, but Fortis again refused to reverse its denial. Thus, in June of 1999, the Lorangs filed suit against Fortis in state District Court. They asserted various claims including breach of contract, breach of

8

fiduciary duty, violation of the UTPA, and violation of the Americans With Disabilities Act. They also asserted a claim for fraud, alleging that Fortis, knowing of Bonnie's ongoing need for prosthetics coverage, had induced them to "upgrade" their policy in 1996 without informing them that the company would thereafter interpret the upgraded policy to preclude coverage for the cost of replacement sockets.

¶27 Fortis removed the suit to federal District Court. In December of 1999, the parties entered into a confidential settlement agreement, and the case was dismissed. Pursuant to the settlement agreement, Fortis rendered payment to settle the Lorangs' various legal claims and to cover the cost of Bonnie's replacement socket as well as the associated materials and service. Thereafter, the insurance policy remained in effect, and the Lorangs continued paying monthly premiums as they had since 1991.

¶28 Subsequently, Bonnie also became insured under a Blue Cross medical policy. She obtained this insurance when she became employed at Lockwood School, an elementary and middle school in Billings. Bonnie had worked for the school as a substitute teacher before she developed cancer. In 2000, she went back to work for the school as a speech therapist aid, and consequently obtained insurance through the school's group plan with Blue Cross.

¶29 By May of 2002, Bonnie again experienced changes in the volume and shape of her residual limb, such that the socket of her prosthesis no longer fit properly. Accordingly, Dr. Whitney Robinson prescribed a replacement socket. This time the socket itself cost $3,900.00, while the associated materials and service cost $11,549.00, for a total of $15,449.00. Bonnie submitted a claim to both Blue Cross and Fortis, along

9

with a letter of medical necessity from Dr. Robinson which stated in part: "[Bonnie] has developed a chronic sore . . . . Socket replacement is medically necessary to prevent further stump injury and loss of ambulation." Blue Cross paid its share of the claim, $9,126.23, leaving Fortis responsible for the remainder of $6,322.77.

¶30 Once again, Fortis denied Bonnie's claim and sent a letter on October 2, 2002, asserting that the Lorangs' policy does not provide coverage for the cost of replacement sockets. Consequently, the Lorangs contacted their attorney, who sent Fortis a demand letter on October 15th. This letter stated that Fortis had violated the UTPA and that the Lorangs would file suit if payment was not rendered in ten days.

¶31 Fortis acknowledged receipt of the letter, but failed to render payment. Thus, the Lorangs filed the instant lawsuit on November 1st. They asserted claims for breach of the insurance contract by non-performance and breach by anticipatory repudiation. They also asserted three claims for violation of the UTPA: (1) misrepresentation of the policy; (2) failure to conduct a reasonable investigation before denial; and (3) failure to act in good faith to promptly settle the claim. Fortis then admitted that the Lorangs' policy provides coverage for the cost of replacement sockets, and rendered payment on December 3rd, which was nearly four months after the claim was submitted.

¶32 A protracted discovery dispute then ensued. The Lorangs attempted to conduct discovery relevant to their position that Fortis' general practice is to deny claims for replacement sockets. To that end, they issued interrogatories requesting, inter alia, information regarding other instances in which Fortis had denied its insureds' claims for replacement sockets, and any lawsuits arising therefrom. Fortis refused to provide this

10

information, objecting inter alia that the information was irrelevant and that the requests were unduly burdensome. Consequently, the Lorangs filed a motion to compel. The District Court then ordered Fortis to respond to these requests and also issued a warning which is indicative of Fortis' tactics during discovery. The court warned: "Responses and objections that are outside the scope of the applicable Rules of Civil Procedure will not be deemed responsive."

¶33 During these proceedings, in June of 2003, one component of Bonnie's socket failed. This component, for which Fortis had previously provided coverage, was immediately replaced in order to restore the socket to functional condition. Bonnie submitted a claim for the replacement cost to both Blue Cross and Fortis, along with a letter of medical necessity from Dr. Whitney Robinson. Blue Cross paid its share of the claim, $860.00, leaving Fortis responsible for the balance of $215.00. Fortis denied the claim and issued yet another letter stating that the Lorangs' policy does not provide coverage. The Lorangs cited this denial to the District Court as further evidence in support of their claims, and Fortis thereafter rendered payment.

¶34 In October of 2003, Fortis filed a motion for dismissal based on a lack of subject-matter jurisdiction, which the District Court denied. The Lorangs then moved for partial summary judgment on liability as to all claims, and Fortis filed a cross-motion for summary judgment on all claims. The District Court granted partial summary judgment on liability in favor of the Lorangs with respect to their claim for breach of contract by non-performance. The court then granted summary judgment in favor of Fortis on the

11

Lorangs' claim for breach of contract by anticipatory repudiation. Finally, the court granted summary judgment in favor of Fortis on the Lorangs' three UTPA claims.

¶35 The Lorangs now appeal the District Court's order denying their motions for partial summary judgment and granting summary judgment in favor of Fortis. Fortis cross-appeals the court's determination that it has subject-matter jurisdiction over this case.[3]

## STANDARD OF REVIEW

¶36 We conduct de novo review of summary-judgment orders, performing the same analysis as does a district court pursuant to Rule 56 of the Montana Rules of Civil Procedure. *LaTray v. City of Havre*, 2000 MT 119, ¶ 14, 299 Mont. 449, ¶ 14, 999 P.2d 1010, ¶ 14.

¶37 Summary judgment may be granted only when there is a complete absence of genuine issues of material fact and the moving party is entitled to judgment as a matter of law. M. R. Civ. P. 56(c); *LaTray*, ¶ 14. The party seeking summary judgment bears the initial burden of establishing a complete absence of genuine issues of material fact. *LaTray*, ¶ 14. To satisfy this burden, the moving party must "exclude any real doubt as to the existence of any genuine issue of material fact" by making a "clear showing as to what the truth is." *Toombs v. Getter Trucking, Inc.*, 256 Mont. 282, 284, 846 P.2d 265, 266 (1993). In doing so, the moving party must contend with our rules which favor the party opposing summary judgment.

---

[3] For the sake of simplicity, we will use the term "replacement socket" hereafter to refer both to the socket itself and the associated materials and service.

¶38 In determining whether genuine issues of material fact exist, we must view all evidence in the light most favorable to the non-moving party. *LaTray*, ¶ 15. Therefore, all reasonable inferences that may be drawn from the evidence must be drawn in favor of the party opposing summary judgment. *LaTray*, ¶ 15. If there is any doubt as to whether a genuine issue of material fact exists, that doubt must be resolved in favor of the party opposing summary judgment. *Newbury v. State Farm Fire & Cas. Ins. Co.*, 2008 MT 156, ¶ 14, 343 Mont. 279, ¶ 14, 184 P.3d 1021, ¶ 14; *Krusemark v. Hansen*, 186 Mont. 174, 177, 606 P.2d 1082, 1084 (1980); *Mathews v. Glacier Genl. Assurance Co.*, 184 Mont. 368, 379, 603 P.2d 232, 238 (1979).

¶39 If the moving party meets its burden of demonstrating a complete absence of genuine issues of material fact, the burden then shifts to the non-moving party to set forth specific facts, not merely denials, speculation, or conclusory statements, in order to establish that a genuine issue of material fact does indeed exist. M. R. Civ. P. 56(e); *LaTray*, ¶ 14. Finally, if no genuine issues of material fact exist, it must then be determined whether the facts actually entitle the moving party to judgment as a matter of law. M. R. Civ. P. 56(c).

## DISCUSSION

¶40 **(1) Did the District Court err in concluding that it has subject-matter jurisdiction over this case?**

¶41 On cross-appeal, Fortis raises this jurisdictional issue in connection with the Lorangs' previous lawsuit against the company, which was settled in 1999. If the District

13

Court does not have subject-matter jurisdiction, the remaining issues in this appeal are moot. Thus, we address Fortis' cross-appeal first.

¶42 As noted above, the Lorangs filed their first lawsuit against Fortis in state District Court, and Fortis removed the case to federal District Court. After the parties reached a settlement, the federal District Court dismissed the case, but issued an order stating that it would retain jurisdiction "for the limited purpose of enforcing the settlement agreement." Based on this order, Fortis filed a motion in this case requesting that the state District Court dismiss for lack of subject-matter jurisdiction. In its motion, Fortis argued that the state District Court lacks subject-matter jurisdiction because the Lorangs' present claims constitute an attempt to enforce the settlement agreement reached in the previous case, over which the federal District Court expressly retained jurisdiction. In response, the Lorangs argued that they did not seek to enforce the settlement agreement, but rather, to enforce the insurance contract and Montana's statutory law governing the conduct of insurers. Then, shortly after filing the motion for dismissal in state District Court, Fortis moved the federal District Court to assume jurisdiction in this matter, again contending that the Lorangs seek to enforce the settlement agreement over which the federal court retained jurisdiction.

¶43 The state District Court concluded that it does have subject-matter jurisdiction, and therefore denied Fortis' motion for dismissal. The federal District Court denied Fortis' motion to assume jurisdiction, concluding that the issues raised in the instant action are not encompassed by the settlement agreement. In doing so, the federal District Court stated that when it retained jurisdiction to enforce the settlement agreement, it did

14

not "assume jurisdiction over all future lawsuits that may arise under the insurance policy between the parties."

¶44 Fortis appealed the federal District Court's ruling to the Ninth Circuit Court of Appeals. Additionally, Fortis presently appeals the state District Court's ruling to this Court, maintaining that subject-matter jurisdiction resides with the federal District Court. At the same time, however, Fortis also asserts in this appeal that the Ninth Circuit's decision will be dispositive of this issue. Specifically, Fortis asserts that if the federal District Court's refusal to assume jurisdiction is upheld on appeal by the Ninth Circuit, then the state District Court is correct in concluding that it has subject-matter jurisdiction over this case.

¶45 We need not address Fortis' assertion that the propriety of the state District Court's decision depends on the decision rendered by the Ninth Circuit Court of Appeals. While the appeal and cross-appeal to this Court were pending, the Ninth Circuit affirmed the federal District Court's decision. *Lorang v. Fortis Ins. Co.*, 135 Fed. Appx. 117 (9th Cir. 2005) (unpublished). Thus, we need not address this jurisdictional issue further, because Fortis now formally agrees that the state District Court has subject-matter jurisdiction over this case.

¶46 **(2) Did the District Court err in precluding evidence of the parties' prior dealings from consideration on summary judgment?**

¶47 In the early stages of this litigation, Fortis sought to preclude evidence of the information in its records regarding the parties' dealings prior to the first lawsuit. In

15

doing so, Fortis asserted that the Lorangs were attempting to use this evidence to "re-litigate" the prior suit and thereby obtain "double recovery."

¶48 The District Court initially rejected Fortis' assertion, observing that "neither party intends any recovery for damages already paid" in the previous lawsuit. The court also rejected Fortis' attempt to limit the evidence, and held: "it will be appropriate for plaintiffs to put the history of their relationship with defendant before the jury." Further, the court noted that it would take steps to ensure that the jury would not award damages for the claims previously settled.

¶49 Despite the court's decision, Fortis persisted in its effort to exclude the evidence contained in its records regarding the parties' prior dealings. Eventually, the District Court changed course by adopting a rationale based on principles of res judicata and collateral estoppel. Consequently, the court ruled that evidence of the parties' dealings prior to the first lawsuit is irrelevant. In making this ruling, the court concluded that it has no "jurisdiction" over such evidence, stating: "This Court's jurisdiction begins with the date of the settlement agreement [in the previous litigation]." Therefore, in deciding the cross-motions for summary judgment, the District Court excluded from consideration the evidence of the parties' dealings prior to the 1999 settlement agreement.

¶50 On appeal, the Lorangs argue that the District Court erred in this regard because the subject evidence is directly relevant to each of their claims and the defenses Fortis asserts. In response, Fortis argues that the evidence is not relevant for any legitimate purpose in this case. Fortis also argues that, in excluding this evidence, the District Court acted within its broad discretion regarding evidentiary matters.

## I. Standard of Review

¶51 First, we address Fortis' argument regarding the standard of review. It is well established, as noted above, that this Court conducts de novo review of summary-judgment orders, and that we do so by engaging in the same plenary analysis as district courts must conduct pursuant to Rule 56 of the Montana Rules of Civil Procedure. *LaTray*, ¶ 14. In contrast to this rule, however, Fortis proffers the "abuse of discretion" standard with respect to the instant issue, suggesting that we grant substantial deference to the District Court's decision.

¶52 Specifically, Fortis relies on *Onstad v. Payless Shoesource*, 2000 MT 230, 301 Mont. 259, 9 P.3d 38, which is one in a series of cases holding that we utilize the "abuse of discretion" standard in reviewing evidentiary rulings. *Onstad*, ¶ 39 (overruled in part on other grounds) (citing *Massman v. City of Helena*, 237 Mont. 234, 240, 773 P.2d 1206, 1210 (1989)). However, *Onstad* holds that we utilize this standard of review in a specific context—i.e., where a district court has issued a discretionary ruling on the admissibility of evidence at trial. *Onstad*, ¶ 39. Rulings in this context are a matter of district courts' "broad discretion" regarding trial matters, and we therefore typically review such rulings pursuant to the "abuse of discretion" standard.[4] *Benjamin v. Torgerson*, 1999 MT 216, ¶ 15, 295 Mont. 528, ¶ 15, 985 P.2d 734, ¶ 15. The *Onstad*

---

[4] There are, however, some instances in which we conduct de novo review of rulings regarding admissibility at trial—i.e., where the district court's decision is based on a conclusion of law. *In re T.W.*, 2006 MT 153, ¶ 8, 332 Mont. 454, ¶ 8, 139 P.3d 810, ¶ 8. This stands in contrast to the common situation which merits the "abuse of discretion" standard of review—i.e., where there is "more than one permissible way to resolve an evidentiary issue" and the district court "is in the best position to make that decision." *Benjamin*, ¶ 15.

17

decision does not suggest that we utilize this same deferential standard in reviewing summary-judgment rulings. In fact, such an approach would conflict with our precedent holding that de novo review of a summary-judgment order "affords no deference to the district court's decision" and demands that we conduct an inquiry "identical" to that of the district court. *See e.g. Renville v. Fredrickson*, 2004 MT 324, ¶ 9, 324 Mont. 86, ¶ 9, 101 P.3d 773, ¶ 9; *Groshelle v. Reid*, 270 Mont. 443, 446, 893 P.2d 314, 316 (1995).

¶53 A district court's ruling on a summary-judgment motion is not a discretionary function which merits deferential review. *Svaldi v. Anaconda-Deer Lodge County*, 2005 MT 17, ¶ 12, 325 Mont. 365, ¶ 12, 106 P.3d 548, ¶ 12; *Cole v. Valley Ice Garden, LLC*, 2005 MT 115, ¶ 4, 327 Mont. 99, ¶ 4, 113 P.3d 275, ¶ 4 (our review of a summary-judgment order is "non-deferential"). Rather, summary judgment requires district courts to make a series of legal conclusions regarding the applicable law, the reasonable inferences to be drawn from the evidence in favor of the non-movant, and the application of law to the undisputed facts and reasonable inferences of fact. *See LaTray*, ¶¶ 14-15, 18; *Carelli v. Hall*, 279 Mont. 202, 207, 926 P.2d 756, 760 (1996). Such conclusions are either correct or incorrect as a matter of law. Therefore, in the context of summary judgment, a decision to categorically exclude certain evidence from consideration is not a discretionary function akin to admitting or excluding evidence at trial. Rather, this determination is a conclusion of law which we must review de novo, just as we review all other aspects of the decision to grant summary judgment. *LaTray*, ¶ 14. Indeed, we have

18

never parsed out different aspects of a summary-judgment ruling for differing standards of review, and we will not accept Fortis' invitation to do so now.[5]

¶54 Here, the District Court ultimately adopted a rationale based on principles of res judicata and collateral estoppel. Consequently, the court concluded that it has no "jurisdiction" over the evidence at issue, and that the evidence is not relevant. As these conclusions of law were part of the court's decision on summary judgment, we review them de novo.

## II. Jurisdiction

¶55 We now turn to the District Court's conclusion that it lacks "jurisdiction" over the evidence at issue.

¶56 "The subject-matter jurisdiction of the district courts is established by the Montana Constitution." *Miller v. District Court*, 2007 MT 149, ¶ 45, 337 Mont. 488, ¶ 45, 162 P.3d 121, ¶ 45. In particular, Article VII, Section 4(1) provides that district courts have "original jurisdiction in . . . all civil matters and cases at law and in equity."

¶57 Subject-matter jurisdiction is a court's fundamental authority to hear and adjudicate a particular class of cases or proceedings. *See Miller*, ¶ 43; *Ballas v. Missoula City Board of Adjustment*, 2007 MT 299, ¶ 15, 340 Mont. 56, ¶ 15, 172 P.3d 1232, ¶ 15; *Peña v. State*, 2004 MT 293, ¶ 21, 323 Mont. 347, ¶ 21, 100 P.3d 154, ¶ 21 (overruled in part on other grounds by *Davis v. State*, 2008 MT 226, ¶ 23, __ Mont. __, ¶ 23, __ P.3d __, ¶ 23); *California v. Western Tire Auto Stores, Inc.*, 207 N.E.2d 474, 476 (Ill. 1965)

---

[5] Moreover, a district court's conclusion as to its jurisdiction is always subject to de novo review, regardless of the context in which the conclusion is made. *Stanley v. Lemire*, 2006 MT 304, ¶ 52, 334 Mont. 489, ¶ 52, 148 P.3d 643, ¶ 52.

19

("Jurisdiction of the subject matter does not mean simple jurisdiction of the particular case then occupying the attention of the court, but jurisdiction of the class of cases to which the particular case belongs."). *See also Eberhart v. United States*, 546 U.S. 12, 16, 126 S. Ct. 403, 405 (2005) (the law of subject-matter jurisdiction is that which delineates the "classes of cases" within a court's adjudicatory authority); *Restatement (Second) of Judgments* § 11 cmt. a (1982) (rules of subject-matter jurisdiction are those which invest a court with "authority to adjudicate a type of controversy"). Both this Court and the litigants before it have, at times, failed to properly recognize this basic principle.

¶58 For example, in *Miller* the defendants' argument treated a filing deadline as a "jurisdictional" rule. *Miller*, ¶ 42. Despite our previous opinions that justified this characterization, we held that the filing deadline is not a "jurisdictional" provision because it does not delineate a class of cases falling within the district courts' adjudicatory authority. *Miller*, ¶¶ 44-46. Likewise, in *Peña* the defendant asserted that he was bringing a "jurisdictional" claim when he challenged the legality of the district court's sentencing decision. *Peña*, ¶¶ 16-18. We held that the challenge was not a "jurisdictional" claim because it did not dispute the court's ability to hear and determine the case. *Peña*, ¶ 25. In doing so, we partially overruled *State v. Moorman*, 279 Mont. 330, 928 P.2d 145 (1996), upon which Peña had understandably relied, because in that case we erroneously treated a sentencing matter as a "jurisdictional" issue. *Peña*, ¶ 25. (In analyzing another issue, we erred in our treatment of the concept of jurisdiction, and thus *Peña* has been overruled in part on other grounds, as noted above. *Davis*, ¶ 23.)

¶59 Similarly, in *State v. Garrymore*, 2006 MT 245, ¶ 10, 334 Mont. 1, ¶ 10, 145 P.3d 946, ¶ 10, the State misused the term "jurisdiction" in conjunction with a rule of appellate review. In response, we noted that the State was actually following this Court's lead to the extent we had erroneously indicated that one of our precedents—a decision regarding appellate review of criminal sentences—is a source of "jurisdiction." *Garrymore*, ¶ 10 n. 1. In reality, we noted, the source of this Court's jurisdiction is Article VII, Section 2 of the Montana Constitution. *Garrymore*, ¶ 10 n. 1.

¶60 Unfortunately, these and other cases demonstrate "the morass into which one is led . . . by loose talk about jurisdiction." *City of Yonkers v. United States*, 320 U.S. 685, 695, 64 S. Ct. 327, 333 (1944) (Frankfurter, J., dissenting). Indeed, we have observed that this Court has sometimes been "profligate" in its use of the term "jurisdiction."[6] *DeShields v. State*, 2006 MT 58, ¶¶ 9-10, 331 Mont. 329, ¶¶ 9-10, 132 P.3d 540, ¶¶ 9-10 (partially overruling *State v. Yorek*, 2002 MT 74, ¶ 15, 309 Mont. 238, ¶ 15, 45 P.3d 872, ¶ 15, where we erroneously stated that the question of whether a court possesses the authority to impose a sentence is a jurisdictional issue). Thus, it is not surprising that litigants and district courts have also misused the concept of jurisdiction by following our precedents. Here, however, the District Court cited no authority in excluding the subject evidence based on the concept of jurisdiction.

¶61 There is no dispute as to whether the District Court has subject-matter jurisdiction over this case. As noted above, Fortis has unsuccessfully disputed this jurisdictional

---

[6] Justice Scalia has coined the phrase "drive-by jurisdictional rulings" to describe incautious treatment of jurisdictional law. *Steel Company v. Citizens for a Better Environment*, 523 U.S. 83, 91, 118 S. Ct. 1003, 1011 (1998).

issue before the state District Court, the federal District Court, and the Ninth Circuit Court of Appeals. However, in the instant appeal Fortis agrees that the state District Court does have subject-matter jurisdiction over this case. *See* ¶¶ 44-45, *supra*. Thus, as neither party disputes the court's authority to hear and adjudicate this case, we start from the agreed-upon premise that the state District Court has subject-matter jurisdiction over this case.

¶62    We reject the notion that a court with subject-matter jurisdiction over a particular case may nonetheless lack jurisdiction over certain evidence presented in support of the claims at issue. The law of subject-matter jurisdiction does not govern the types of evidence properly considered in a case; rather, it designates the various classes of cases within a court's adjudicatory authority. *See e.g. Eberhart*, 546 U.S. at 16, 126 S. Ct. at 405. Thus, in determining whether to exclude evidence from consideration on summary judgment, the District Court was faced not with a jurisdictional issue, but with an evidentiary issue. A court's jurisdiction over the subject-matter of a case—i.e., the authority to hear and adjudicate the action—necessarily entails the authority to decide all evidentiary issues presented therein, see *Peña*, ¶ 21, and such jurisdiction is not diminished in any way by the nature of the evidence a party proffers in support of a claim or defense. Thus, as the District Court undisputedly had subject-matter jurisdiction over this case, it was obligated to determine the evidentiary issues based on the applicable law, which we discuss below.

22

## III. Re-litigation of the Prior Lawsuit

¶63　We now turn to the District Court's conclusion that evidence of the parties' prior dealings must be excluded based on the resolution of the Lorangs' first lawsuit against Fortis.

¶64　As noted, Fortis attempted to persuade the District Court that the Lorangs' use of this evidence would lead to a re-litigation of the previous lawsuit in conjunction with the new claims in this case. The court initially rejected Fortis' arguments and determined that the Lorangs would be permitted to utilize this evidence. However, the court subsequently changed course, relying on principles of res judicata and collateral estoppel.

¶65　The doctrine of res judicata, which embodies the concept of "claim preclusion," bars the re-litigation of claims a party has already had an opportunity to litigate. *Baltrusch v. Baltrusch*, 2006 MT 51, ¶ 15, 331 Mont. 281, ¶ 15, 130 P.3d 1267, ¶ 15. The doctrine of collateral estoppel, which embodies the concept of "issue preclusion," is a form of res judicata which bars a party from re-litigating an issue, as opposed to an entire claim, where that issue has been litigated and determined in a prior suit. *Baltrusch*, ¶ 15; *State v. Ditton*, 2006 MT 235, ¶ 40, 333 Mont. 483, ¶ 40, 144 P.3d 783, ¶ 40.[7]

¶66　Relying on these principles, the District Court concluded that because the Lorangs had settled their prior suit against Fortis, evidence of the parties' dealings prior to that

---

[7] Although we need not substantively address it here, we note the trend toward clarifying these concepts by the use of more precise terminology. *See Northern States Power Co. v. Bugher*, 525 N.W.2d 723, 727 (Wis. 1995); *Baker v. General Motors Corp.*, 522 U.S. 222, 233 n. 5, 118 S. Ct. 657, 664 n. 5 (1998).

23

suit could not be considered in the instant action. As a part of this reasoning, the court held, as noted above, that it lacked "jurisdiction" over the evidence involved in the prior suit. The court also determined that the Lorangs' use of this evidence would lead to a "re-litigation" of the prior lawsuit. We disagree with this rationale.

¶67 First, principles of claim preclusion and issue preclusion do not limit a court's authority to adjudicate all evidentiary issues in an action where the court has subject-matter jurisdiction. *See* ¶ 62, *supra*. Second, as our precedents indicate, the fact that certain evidence was relevant in a previous suit does not establish that utilizing the evidence in a subsequent suit leads to re-litigation of claims or issues previously litigated.

¶68 For example, in *Fadness v. Cody*, 287 Mont. 89, 93-94, 951 P.2d 584, 587 (1997), the plaintiffs brought consecutive lawsuits arising out of one real-estate transaction. The first suit was an action to quiet title, to foreclose on a mortgage, and for fraud by the purchaser, while the second suit was an action for negligence and breach of fiduciary duty by the real-estate agent and the closing agent. *Fadness*, 287 Mont. at 93-94, 96-97, 951 P.2d at 587-89. We held that collateral estoppel was not implicated in the second suit because the issues raised for decision therein were different from the issues in the first suit. *Fadness*, 287 Mont. at 96-97, 951 P.2d at 589 (As we stated, "[t]he fact that each action arises from the same transaction does not mean that each involve the same issues."). Thus, the plaintiffs' second suit was not a re-litigation of issues in the first suit, despite the fact that the evidentiary basis for both suits involved the same transaction. *Fadness*, 287 Mont. at 95-97, 951 P.2d at 588-89.

24

¶69 We rendered a similar decision in *Finstad v. W.R. Grace & Co.*, 2000 MT 228, ¶¶ 25-31, 301 Mont. 240, ¶¶ 25-31, 8 P.3d 778, ¶¶ 25-31. There, the plaintiffs supported their claim for punitive damages by utilizing some of the same evidence that was involved in previous litigation against the defendant. *Finstad*, ¶ 30. We held that this approach did not implicate collateral estoppel because the issues regarding punitive damages in the subsequent case were not identical to those previously litigated. *Finstad*, ¶¶ 30-31. Thus, the plaintiffs' use of evidence that was relevant in the prior litigation did not lead to a re-litigation of the issues previously determined. *Finstad*, ¶¶ 30-31.

¶70 We have also rendered a similar decision in the context of a UTPA action. In *Graf v. Continental Western Ins. Co.*, 2004 MT 105, ¶ 6, 321 Mont. 65, ¶ 6, 89 P.3d 22, ¶ 6, the plaintiff brought consecutive lawsuits, a negligence action and a UTPA action, and the evidentiary basis for both suits involved a single automobile accident. The district court ruled that the plaintiff's second suit, the UTPA action, was barred by collateral estoppel because she was attempting to re-litigate the liability issue resolved in the first suit. *Graf*, ¶ 20. We reversed, holding that collateral estoppel was not implicated because the issues raised in each case were not the same. *Graf*, ¶¶ 12, 21. Specifically, the issue in the first case was whether the facts of the accident established liability on the part of the other driver. *Graf*, ¶¶ 12-21. The issue in the second case was, inter alia, whether the insurer violated the UTPA in light of its knowledge regarding the facts of the accident. *Graf*, ¶¶ 12-21. Thus, because the issues raised in the two cases were different, we held that the second suit did not constitute a re-litigation of the first suit, despite the

25

fact that the evidentiary basis of both suits involved the facts of the accident. *Graf*, ¶ 21 (noting "one does not have to 're-litigate' the question of liability [for negligence] in pursuing the UTPA claim").

¶71 In addition to these cases, we have issued numerous decisions, in various contexts, which demonstrate this principle—i.e., that where the claims and issues raised in consecutive suits are different, the subsequent use of evidence that was relevant in the first suit does not constitute re-litigation.[8]

---

[8] For example, in *Marriage of Stout*, 216 Mont. 342, 348-51, 701 P.2d 729, 733-34 (1985), where the petitioner instituted proceedings to modify a dissolution decree, we held that neither res judicata nor collateral estoppel precluded the use of evidence from an earlier proceeding regarding termination of parental rights, because the issues in the two proceedings were different. Similarly, in *Matter of Raymond W. George Trust*, 1999 MT 223, ¶¶ 5, 42-50, 296 Mont. 56, ¶¶ 5, 42-50, 986 P.2d 427, ¶¶ 5, 42-50, where the evidentiary basis of the suit involved a trust which had already been the subject of two prior suits, we held that neither res judicata nor collateral estoppel barred the parties from contesting their respective interests in the trust. We stated: "While the subject matter of the litigation—the Raymond W. George Trust—is the same as the earlier litigation, the issue raised in this instant case is not the same issue that was raised in the earlier cases." *Matter of George Trust*, ¶ 49. Therefore, the use of evidence regarding the trust in subsequent litigation did not constitute re-litigation of the issues in the prior cases. *Matter of George Trust*, ¶¶ 45-46, 48-50. Likewise, in *Holtman v. 4-G's Plumbing & Heating, Inc.*, 264 Mont. 432, 439-40, 872 P.2d 318, 322-23 (1994), where one set of events constituted the evidentiary basis for a litigant's counter-claims in a first suit and his claims in a second suit, we held that collateral estoppel was not implicated because the issues raised in each suit were different. *See also Lane v. District Court*, 2003 MT 130, ¶¶ 19-37, 316 Mont. 55, ¶¶ 19-37, 68 P.3d 819, ¶¶ 19-37 (consecutive lawsuits between the same parties both involved the facts surrounding a purchase agreement, but res judicata was not implicated); *Scott v. Henrich*, 283 Mont. 97, 101-04, 938 P.2d 1363, 1366-68 (1997) (a prior federal-law action and a subsequent state-law action both arose from the same incident wherein the plaintiff's husband was killed by a police officer, but res judicata was not implicated); *Lund v. State Comp. Mut. Ins. Fund*, 263 Mont. 346, 351-52, 868 P.2d 611, 614 (1994) (evidence of a single on-the-job injury was the subject of consecutive actions for workers' compensation benefits, but neither res judicata nor collateral estoppel were implicated); *Anderson v. State*, 250 Mont. 18, 19-22, 817 P.2d 699, 700-02 (1991) (consecutive legal actions both involved the facts surrounding the seizure and suspension of a driver's license, but collateral estoppel was not implicated); *Estate of Watkins v. Hedman, Hileman & Lacosta*, 2004 MT 143, ¶¶ 31-34, 321 Mont. 419, ¶¶ 31-34, 91 P.3d 1264, ¶¶ 31-34 (the evidentiary basis of consecutive lawsuits involved an improperly drafted trust, but neither res judicata nor collateral estoppel were implicated). *See also Slater v. Central Plumbing*

¶72 As in the above-noted cases involving consecutive legal actions, the claims and issues raised in this suit are distinct from those in the Lorangs' prior suit against Fortis. Specifically, the Lorangs' first suit asserted claims for breach of contract, breach of fiduciary duty, fraud, violation of the Americans With Disabilities Act, and violations of the UTPA, inter alia. In support of these claims, the Lorangs alleged that Fortis improperly denied Bonnie's 1998 claim, despite having previously admitted that the policy provides coverage for replacement sockets. The Lorangs also alleged that Fortis, knowing of Bonnie's ongoing need for prosthetics coverage, had induced them to "upgrade" their policy in 1996 without informing them that Fortis would thereafter interpret the upgraded policy to preclude coverage for replacement sockets.

¶73 Conversely, the Lorangs' instant action alleges wrongdoing by Fortis after the first suit was settled. Based on this subsequent conduct, the Lorangs now allege that Fortis has again breached the insurance contract and committed UTPA violations, in accordance with its general practices regarding prosthetics claims. Yet, while liability in this case depends on Fortis' conduct in 2002, the parties' prior dealings are inextricably linked to the present claims. For example, one of the primary factual issues in this case is whether Fortis conducted a reasonable investigation before denying Bonnie's 2002 claim. As explained in more detail below, this issue requires an evaluation of the information Fortis possessed when it denied the claim, such as the company's documented inconsistent representations regarding the policy, the company's prior admissions that the policy

---

*& Heating Co.*, 1999 MT 257, ¶¶ 27, 31, 297 Mont. 7, ¶¶ 27, 31, 993 P.2d 654, ¶¶ 27, 31; *Phelan v. Lee Blaine Enterprises*, 220 Mont. 296, 299-303, 716 P.2d 601, 602-05 (1986); and *Stapleton v. First Security Bank*, 207 Mont. 248, 258, 675 P.2d 83, 89 (1983).

provides coverage for replacement sockets, and its payment of Bonnie's prior claims which were virtually identical to her 2002 claim. However, in presenting this information from Fortis' files, the Lorangs are not seeking to hold Fortis liable for its prior conduct reflected in these documents; rather, liability in this case depends on Fortis' conduct in 2002. Thus, although the subject evidence was relevant in the prior litigation, the jury's consideration of this evidence in evaluating the Lorangs' present claims does not constitute re-litigation of Fortis' liability asserted in the first lawsuit.

¶74   We recognize that the Lorangs' second suit asserts some of the same legal theories of recovery as were asserted in the first suit. We also recognize that both suits arose from the parties' ongoing relationship and Fortis' obligations under the insurance policy. However, the two lawsuits represent distinct causes of action because each arises from different instances of alleged wrongdoing. Therefore, because the claims and issues to be resolved in this case are distinct from those resolved in the first case, the Lorangs' present use of evidence which was relevant in the prior suit does not constitute a re-litigation of that action. *See e.g. Fadness*, 287 Mont. at 95-97, 951 P.2d at 588-89; *Finstad*, ¶¶ 30-31; *Graf*, ¶¶ 12-21.

¶75   Indeed, re-litigation of the first suit would require the jury to determine whether Fortis' pre-2002 conduct satisfies the elements of the various claims asserted in the Lorangs' first lawsuit. Another type of re-litigation would involve asking the jury to determine whether Fortis' pre-2002 conduct satisfies the elements of the legal theories asserted in the instant action. However, the Lorangs do not seek any such determinations. Rather, as explained in more detail below, the Lorangs seek to utilize the

28

evidence of prior dealings to reveal the specific information Fortis possessed when it investigated Bonnie's 2002 claim. Additionally, the Lorangs seek to utilize this evidence to rebut Fortis' defenses and to demonstrate that Fortis' 2002 denial represents a general practice with respect to these types of claims. Further, the Lorangs seek to utilize this evidence to provide context for the instant claims by revealing the history of their relationship with Fortis. As for this particular use of the evidence, we have previously addressed such an approach in response to arguments of res judicata and collateral estoppel.

¶76    In *Berlin v. Boedecker*, 268 Mont. 444, 446, 448, 452, 887 P.2d 1180, 1181-82, 1185 (1994), where the parties had entered into several investment transactions, the plaintiffs brought claims against their investment agent for breach of contract and breach of fiduciary duty, inter alia, based on the defendant's conduct in two of these transactions. At trial, the plaintiffs relied on evidence which was introduced in a prior lawsuit between the parties—a suit which arose from another transaction they had entered into with the defendant. *Berlin*, 268 Mont. at 451-52, 887 P.2d at 1184-85. On appeal in the second suit, the defendant argued that the plaintiffs' subsequent use of the same evidence constituted a re-litigation of the prior lawsuit, and that res judicata was therefore implicated in the second suit. *Berlin*, 268 Mont. at 451-52, 887 P.2d at 1184-85. The defendant also argued that collateral estoppel was implicated by this alleged re-litigation of the prior suit. *Berlin*, 268 Mont. at 453, 887 P.2d at 1185-86. We rejected these arguments, noting that the two lawsuits were based on different instances of alleged wrongdoing, and that different issues were raised in each case. *Berlin*, 268 Mont. at

29

452-53, 887 P.2d at 1185-86. We also stated that the subject evidence—evidence of the parties' various interactions—was introduced in the first suit "because it provided a background on the parties' series of transactions and their relationship." *Berlin*, 268 Mont. at 452, 887 P.2d at 1185. Thus, the plaintiffs' use of the same evidence in the second suit did not constitute a re-litigation of the first suit. *Berlin*, 268 Mont. at 452-54, 887 P.2d at 1185-86.

¶77 Similarly here, the Lorangs seek to utilize the evidence of prior dealings not to re-litigate the prior lawsuit or Fortis' prior actions, but to explain the history of their relationship with Fortis and thereby provide context for the instant claims. Furthermore, like the consecutive lawsuits in *Berlin*, the alleged instances of wrongdoing and the issues raised in this case are different than those raised in the Lorangs' prior suit against Fortis. Therefore, as with the *Berlin* plaintiffs' use of the same evidence in consecutive lawsuits, the Lorangs' use of evidence regarding the history of their relationship with Fortis does not constitute a re-litigation of the claims or issues raised in the first lawsuit. This conclusion is consistent with our decisions in *Fadness*, *Graf*, *Finstad*, and numerous other cases where we held that utilizing the same evidence in consecutive lawsuits did not amount to re-litigation. *See* ¶ 71 n. 8, *supra*.

¶78 Accordingly, we hold that the District Court erred in applying concepts of claim preclusion and issue preclusion to exclude the evidence of prior dealings between Fortis and the Lorangs.

**IV. Admissibility**

¶79 Having determined that evidence of the parties' prior dealings is not barred from consideration based on concepts of jurisdiction, claim preclusion, or issue preclusion, we now turn to the governing law.

¶80 The evidence properly considered on summary judgment depends on the substantive legal principles applicable to the claims at issue. *McGinnis v. Hand*, 1999 MT 9, ¶ 6, 293 Mont. 72, ¶ 6, 972 P.2d 1126, ¶ 6. Within the context of this substantive law, only admissible evidence may be considered. *Carelli*, 279 Mont. at 207, 926 P.2d at 760; *Brown v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 197 Mont. 1, 7, 640 P.2d 453, 456 (1982). Although a particular piece of evidence is inadmissible for one purpose, it may yet be properly considered on summary judgment if it is admissible for another purpose. *McDermott v. Carie, LLC*, 2005 MT 293, ¶¶ 20-21, 329 Mont. 295, ¶¶ 20-21, 124 P.3d 168, ¶¶ 20-21. Thus, evidence must be assessed in light of the purpose for which it is offered. *McDermott*, ¶¶ 20-21.

¶81 Here, the Lorangs assert claims for breach of contract by non-performance, breach by anticipatory repudiation, and claims for three violations of the UTPA: (1) misrepresentation of the insurance policy; (2) failure to conduct a reasonable investigation before denying the claim; and (3) failure to act in good faith to effectuate a prompt, fair, and equitable settlement when liability was reasonably clear.[9] In

---

[9] All statutory references in this Opinion are to the 2001 version of the Montana Code, which was in effect during the time period relevant to this case. *See Boettcher v. Montana Guaranty Fund*, 2007 MT 69, ¶ 14, 336 Mont. 393, ¶ 14, 154 P.3d 629, ¶ 14.

conjunction with these causes of action, the Lorangs also assert that Fortis is liable for compensatory and punitive damages.

¶82 The claim for breach of contract by non-performance is not at issue here, as Fortis has not appealed the District Court's decision to grant partial summary judgment on liability in favor of the Lorangs. With respect to the Lorangs' claim of anticipatory breach of contract, and their claim that Fortis misrepresented the insurance policy in violation of the UTPA, we do not discuss the admissibility of evidence regarding the parties' prior dealings. That is because, as explained below, we conclude that summary judgment is properly rendered on these claims regardless of whether evidence of prior dealings is considered. Therefore, we turn to the remaining claims.

## A. Failure to Conduct a Reasonable Investigation Before Denial

¶83 The Lorangs claim that Fortis, in accordance with its general practices regarding prosthetics claims, violated that portion of the UTPA which states that insurers may not "refuse to pay claims without conducting a reasonable investigation based upon all available information." Section 33-18-201(4), MCA. As the plain statutory language dictates, the issue of whether an insurer's investigation was reasonable requires an analysis of all information available to the insurer when it denied the claim. Therefore, our precedents hold that the jury must consider, at a minimum, the insurer's own records. *Peterson v. The Doctors' Co.*, 2007 MT 264, ¶ 33, 339 Mont. 354, ¶ 33, 170 P.3d 459, ¶ 33 (where an insurer has allegedly failed to conduct a reasonable investigation, the UTPA action functions to "test the propriety of the actions taken or not taken by the insurer *in light of the information possessed by the insurer* at the time it adjusted the

32

underlying claim") (emphasis added); *Graf*, ¶ 17 (to properly evaluate a UTPA claim, the jury must be "aware of everything in the claims file," such as "investigative reports, evaluations and correspondence").

¶84 Here, apart from any other information Fortis may have been obligated to obtain, the information most readily available to Fortis was its own records. Those records contain the evidence of the parties' prior dealings which establish that Fortis was obligated to honor Bonnie's 2002 claim, as the company has conceded in this litigation. Therefore, evidence of the parties' prior dealings contained in Fortis' own files, being part of the information readily available to Fortis, is necessarily admissible for the jury's consideration of whether Fortis violated § 33-18-201(4), MCA. *Peterson*, ¶ 33; *Graf*, ¶ 17.

¶85 We note the implications of holding otherwise. If we held that Fortis' records are not admissible, the jury would be presented with an inaccurate picture of the circumstances in which Fortis made its decision regarding Bonnie's 2002 claim. We could not expect a UTPA trial to serve its intended purpose under such circumstances. This approach would distort the jury's assessment of the insurer's knowledge and conduct, and thereby unfairly prejudice either the plaintiff or the defendant, depending on the nature of the excluded evidence. That is, exclusion would unfairly prejudice claimants where, as in this case, the records demonstrate the insurer's obligation to pay the claim at issue. Similarly, exclusion would unfairly prejudice insurers where the records contain evidence demonstrating that the claims-investigation process was in fact reasonable. In this latter scenario, the plaintiff would obviously obtain an unfair

33

advantage at the defendant's expense. In the same way, here, Fortis would obtain an unfair advantage at the Lorangs' expense if its own records were excluded from consideration.

¶86 As we have previously observed, the UTPA is designed to protect claimants against insurers who would deny a claim without first conducting a reasonable investigation. *Peterson*, ¶ 43; *O'Fallon v. Farmers Ins. Exchange*, 260 Mont. 233, 242, 859 P.2d 1008, 1014 (1993). We conclude the UTPA cannot provide such protection if the insurer's records are excluded from consideration. Nor can an insurer properly explain a reasonable investigation without reference to its own records. Indeed, without considering the insurer's own records, it is impossible to assess the reasonableness of the investigation at issue, and therefore impossible to litigate the UTPA claim.

¶87 Most important, however, is the plain language of the UTPA. The Legislature has utilized unmistakable terms which establish that all information available to the insurer must be considered. Section 33-18-201(4), MCA. Our decision in *Peterson* followed this clear statutory language. In that case, both parties sought to exclude different portions of information the insurer possessed during its consideration of the claim. *Peterson*, ¶¶ 32, 36. The insurer successfully persuaded the district court to exclude letters and correspondence it had obtained, and we held that this was reversible error because it "prevented the [claimants] from establishing the *full extent* of the information possessed by [the insurer] at the time it adjusted their claim." *Peterson*, ¶¶ 32-35 (emphasis added). Likewise, the claimants argued that other information gathered by the insurer was inadmissible, and we rejected this argument because the evidence constituted

34

"a truthful representation of the information used in the [claims-adjustment] process at issue." *Peterson*, ¶ 39.

¶88    The "public policy embodied in the UTPA [is that] insurer conduct is to be retrospectively measured against the standards adopted by the Legislature," and those "UTPA standards focus on *what the insurer knows* at a particular point in time." *Graf*, ¶¶ 17-18 (emphasis added). Consequently, the very essence of a UTPA claim "is that an insurer, given [the] *information available to it,* has acted unreasonably in adjusting a claim." *Peterson*, ¶ 43 (emphasis added). Thus, simply put, the information in an insurer's records is critical in determining whether a UTPA violation has occurred. In some cases, this information will benefit the plaintiff, while in other cases it will benefit the defendant. Either way, whether used as a sword or a shield, this evidence is necessarily admissible in assessing the reasonableness of the investigation at issue.[10] *Peterson*, ¶¶ 32-39; *Graf*, ¶¶ 17-18. Accordingly, we hold that the evidence of the parties' prior dealings contained in Fortis' records is necessarily admissible for the jury's consideration of whether Fortis failed to conduct a reasonable investigation in violation of § 33-18-201(4), MCA.

**B. Failure to Act in Good Faith in Settlement**

¶89    The Lorangs also claim that Fortis, in accordance with its general practices regarding prosthetics claims, violated the UTPA's provision that insurers may not

---

[10]    Of course, we recognize that some portions of an insurer's records may be inadmissible pursuant to overriding rules regarding the work-product doctrine or the attorney-client privilege. *See e.g. Palmer v. Farmers Ins. Exchange*, 261 Mont. 91, 105-20, 861 P.2d 895, 904-13 (1993); *Kuiper v. District Court*, 193 Mont. 452, 456-63, 632 P.2d 694, 696-700 (1981). However, no such issues have been raised in this case.

35

"neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." Section 33-18-201(6), MCA. Pursuant to the plain statutory language, this claim requires an initial determination of whether Fortis' liability was reasonably clear with respect to Bonnie's 2002 claim. If that question is answered in the affirmative, it must then be determined whether Fortis acted promptly and in good faith given its clear responsibility to cover her claim. These determinations, like the assessment of Fortis' investigative efforts, must be made in light of the information Fortis possessed when it considered Bonnie's 2002 claim. *Peterson*, ¶ 33 (where an insurer has allegedly failed to act in good faith in settling a claim, the UTPA action functions to "test the propriety of the actions taken or not taken by the insurer *in light of the information possessed by the insurer* at the time it adjusted the underlying claim") (emphasis added); *Graf*, ¶ 17 (to properly evaluate a UTPA claim, the jury must be "aware of everything in the claims file," such as "investigative reports, evaluations and correspondence"). Here, Fortis' records contain evidence of the parties' prior dealings—i.e., the protracted wrangling which prompted Fortis to repeatedly admit coverage and pay Bonnie's previous claims which were virtually identical to her 2002 claim. Thus, the evidence of these prior dealings, which Fortis possessed at the time it was obligated to act in good faith regarding Bonnie's 2002 claim, is necessarily admissible for the jury's consideration of whether Fortis violated § 33-18-201(6), MCA.

**C. Punitive Damages**

¶90 The Lorangs have also asserted a claim for punitive damages. Montana's statutory law provides that punitive damages may be assessed against an insurer which has

36

committed the UTPA violations alleged here. Section 33-18-242(4), MCA; *Dees v. American Natl. Fire Ins. Co.*, 260 Mont. 431, 444, 861 P.2d 141, 149 (1993).

¶91 To prevail on this claim, the Lorangs must prove that Fortis' conduct amounts to "actual fraud or actual malice" as statutorily defined for the independent purpose of assessing punitive damages. Section 27-1-221, MCA.[11] Here, the Lorangs have alleged that Fortis acted with actual malice, which is statutorily defined as follows:

> A defendant is guilty of actual malice if the defendant has knowledge of facts or intentionally disregards facts that create a high probability of injury to the plaintiff and:
> (a) deliberately proceeds to act in conscious or intentional disregard of the high probability of injury to the plaintiff; or
> (b) deliberately proceeds to act with indifference to the high probability of injury to the plaintiff.

Section 27-1-221(2), MCA. An "injury to the plaintiff" includes a deprivation of the benefits of one's property. Section 27-1-106(2), MCA.

¶92 The statutory language demonstrates that, as with proof of the alleged UTPA violation itself, proof of actual malice depends on what the insurer knew or disregarded when it considered the subject claim. As we have explained above, the inquiry into what Fortis knew requires an assessment of Fortis' records which contain the history of the parties' prior dealings regarding the issue of prosthetics coverage. In other words, Fortis' records bear directly on the relevant issue of whether Fortis had knowledge of facts or intentionally disregarded facts (which the Lorangs assert is Fortis' general business practice) creating a high probability of depriving the Lorangs of benefits due under the

---

[11] Under this statute, "actual fraud" and "actual malice" are specifically defined for the purpose of establishing liability for punitive damages, independent of how these concepts are defined in other areas of the law.

37

insurance policy. Indeed, without considering the information in Fortis' records, it would be impossible to assess what Fortis knew or disregarded.

¶93 Moreover, if the jury determines that punitive damages should be awarded here, assessing a proper amount requires analysis of the reprehensibility of Fortis' conduct, which is determined in part by considering whether this was an isolated incident. *Seltzer v. Morton*, 2007 MT 62, ¶¶ 162-67, 174, 336 Mont. 225, ¶¶ 162-67, 174, 154 P.3d 561, ¶¶ 162-67, 174 (citations omitted). Here, the evidence of the parties' prior dealings speaks directly to this issue. Accordingly, the evidence of the parties' prior dealings contained in Fortis' records is necessarily admissible as to the Lorangs' punitive damages claim.[12]

## D. Fortis' Defense Strategy

¶94 Evidence of the parties' prior dealings is also admissible with respect to certain aspects of Fortis' defense strategy. First, we note Fortis maintains that its denial of Bonnie's 2002 claim was a mistake. The record contains evidence that it was a mistake, in the sense that this denial was inconsistent with Fortis' prior admissions of coverage. However, the record also contains evidence that it was not a mistake in the sense that this denial was consistent with Fortis' general practices and previous attempts to withhold

---

[12] Of course, no punitive damages may be assessed to punish Fortis for its wrongful denials prior to 2002, because Fortis' liability for that conduct was litigated in the prior lawsuit. However, Fortis' prior conduct is nonetheless an important consideration on a limited basis—i.e., a recidivist may be punished more severely than a first-time offender where, as here, "the conduct in question replicates the prior transgressions." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423, 123 S. Ct. 1513, 1523 (2003). In such circumstances, the previously litigated conduct cannot serve as a basis for determining whether punitive damages should be assessed, but it may be considered to the extent it demonstrates a pattern of wrongdoing and therefore suggests that "strong medicine is required to cure the defendant's disrespect for the law," *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 577, 116 S. Ct. 1589, 1599 (1996).

coverage for virtually identical claims. In any event, the issue of whether this denial was in fact a mistake or part of the alleged general practice regarding prosthetics claims, bears directly on the issue of Fortis' alleged malice. As we have explained above, evidence of the parties' prior dealings is admissible for the Lorangs' purpose of proving malice. For the same reasons, this evidence is also admissible for the Lorangs' purpose of rebutting Fortis' "mistake" defense. *See Peterson*, ¶¶ 32-35 (holding that the district court committed reversible error by excluding information which the insurer possessed because that prevented the claimants from, inter alia, rebutting the defenses raised by the insurer in the UTPA trial).

¶95 Second, throughout these proceedings Fortis has characterized the Lorangs and their counsel as unjustifiably litigious for "rushing" to file this lawsuit without first attempting alternative measures to obtain the insurance benefits. Of course, the Lorangs will be entitled to rebut this argument if it is made at trial. In this regard, evidence of the parties' prior dealings is highly relevant. That is, it reveals that Bonnie had previously attempted alternative measures to obtain coverage—i.e., repeated requests for reconsideration prior to the first lawsuit—only to be met with more denials. This evidence also reveals that Fortis provided coverage for Bonnie's 1994 claim and her 1996 claim only after intervention by the Insurance Commissioner, and that Fortis provided coverage for Bonnie's 1998 claim only after she filed suit. Accordingly, we hold that to the extent Fortis attempts to portray the Lorangs and their counsel as unjustifiably litigious in this matter, evidence of the parties' prior dealings will be admissible for the

purpose of illuminating the circumstances which prompted the Lorangs to file this lawsuit.

## E. Cautionary Instruction

¶96   Finally, we again acknowledge Fortis' concern with "re-litigation" of the prior lawsuit. The issue to be litigated in this case is whether Fortis is liable for its conduct in denying Bonnie's 2002 claim. The Lorangs may not re-litigate Fortis' liability for its pre-2002 conduct, as that issue was settled in the prior lawsuit. Yet, we have held that evidence of the parties' prior dealings, which includes Fortis' pre-2002 conduct, is admissible. Thus, we stress that this evidence of prior dealings is admissible for the specific purposes we have described, as is necessary for the litigation of this action; the primary purpose, of necessity, being to inform the jury of what information Fortis knew and had access to when it denied Bonnie's 2002 claim. This evidence may also be admissible for other limited purposes, depending on subsequent developments in this case. However, in no event may this evidence be used in a manner suggesting that Fortis may now be held liable for its pre-2002 conduct. Again, liability for that conduct has been settled, and evidence of that conduct is now admissible only for certain purposes other than pre-2002 liability.

¶97   The underlying principle here is that admissibility depends on the purpose for which the evidence is to be used—i.e., evidence may be inadmissible for some purposes and yet admissible for others. *McDermott*, ¶¶ 20-21. Of course, where a party is properly permitted to utilize evidence that is inadmissible for certain purposes, there may be a risk that the jury considers such evidence in an improper manner. This concern

arises in numerous scenarios, and we therefore have law directly on point. Rule 105 of the Montana Rules of Evidence provides that where evidence is inadmissible for one purpose and yet admissible for another, "the court, upon request, shall restrict the evidence to its proper scope and instruct the jury accordingly." Thus, because evidence of the parties' prior dealings is admissible only for certain limited purposes, Fortis is entitled to a cautionary instruction in this regard.[13]

## V. Conclusion

¶98 In summary, evidence of the parties' prior dealings may not be used to re-litigate Fortis' liability for its pre-2002 conduct. However, we conclude that such evidence is admissible for the various purposes described above, given the legal principles governing the UTPA claims asserted here. It may also be admissible for other limited purposes, depending on how the trial unfolds. Thus, we hold that the District Court erred in excluding this evidence from consideration on summary judgment.

¶99 **(3) Did the District Court err in ruling on the cross-motions for summary judgment regarding the Lorangs' claim for anticipatory breach of contract?**

¶100 Under our statutory law, an insured may maintain an action for breach of contract against an insurer, in addition to a UTPA action. Section 33-18-242(3), (6)(a), MCA (barring all actions by insureds except claims for breach of contract, fraud, and UTPA violations).

¶101 Here, the Lorangs filed two claims for breach of contract. With their first claim, the Lorangs alleged that Fortis breached the contract by non-performance—i.e., by

---

[13] If the jury determines that punitive damages are warranted, such a cautionary instruction will be particularly important. *See* ¶ 93 n. 12, *supra.*

41

violating its then-present duty to cover Bonnie's 2002 claim for the cost of a replacement socket. Fortis eventually conceded that it had wrongfully denied Bonnie's claim, and the District Court granted partial summary judgment on liability in favor of the Lorangs as to this claim. Fortis has not appealed the court's ruling, and therefore this first breach-of-contract claim is not at issue on appeal.

¶102 Additionally, the Lorangs alleged that Fortis breached the contract by repudiating its future obligations—i.e., by repudiating its duty to cover Bonnie's future claims for replacement sockets. Our precedents recognize this as a claim of breach by anticipatory repudiation, or "anticipatory breach of contract." *STC, Inc. v. City of Billings*, 168 Mont. 364, 370-72, 543 P.2d 374, 377-78 (1975); *Chamberlin v. Puckett Construction*, 277 Mont. 198, 202, 921 P.2d 1237, 1239 (1996). The Lorangs moved for partial summary judgment on liability as to this claim, and Fortis then filed a cross-motion for summary judgment. The District Court considered these motions together and issued an order in which it denied the Lorangs' motion and granted Fortis' motion. On appeal, the Lorangs argue that the court erred in ruling on these cross-motions.

¶103 As we have held, summary judgment is appropriate where there are no genuine disputes as to the facts which are material to a claim. *LaTray*, ¶ 14. Here, neither Fortis nor the Lorangs raise any disputes as to the material facts regarding this claim of anticipatory breach. Rather, both parties argue that they are entitled to summary judgment based on the application of law to the undisputed facts. Similarly, we perceive no disputes regarding material facts which would preclude summary judgment, and we therefore turn to the applicable law.

42

¶104 An anticipatory breach of contract is a breach which occurs before the contractually-established time for performance has arrived. *Chamberlin*, 277 Mont. at 202, 921 P.2d at 1239. This type of breach is committed when a party repudiates a contractual duty. *Chamberlin*, 277 Mont. at 202, 921 P.2d at 1239. We have held that "repudiation" in this context is "a positive statement to the promisee or other person having a right under the contract, indicating that the promisor will not or cannot substantially perform his contractual duties."[14] *STC*, 168 Mont. at 374, 543 P.2d at 379 (citation and internal quotation marks omitted). Because repudiation creates an immediate right of action for breach of contract even though the time for performance has not yet arrived, we have set a high bar for the type of "positive statement" that qualifies as a repudiation.[15] *STC*, 168 Mont. at 372-74, 543 P.2d at 378-79. A mere expression of intent will not suffice. *STC*, 168 Mont. at 374, 543 P.2d at 379. Rather, repudiation must appear "only in the clearest terms"—that is, it must be absolute and unequivocal.[16] *STC*, 168 Mont. at 373-74, 543 P.2d at 379.

---

[14] There is a distinction between a denial of liability based on factual issues, and a repudiation of a contractual duty. It is important "to remember what repudiation is not. A denial that the facts entitle insured to recovery under the policy is not a repudiation." *Continental Casualty Co. v. Boerger*, 389 S.W.2d 566, 568 (Tex.Civ.App. 1965) (citation omitted).

[15] Repudiation may also be accomplished by a party's voluntary act that makes it impossible for him or her to perform as promised. Arthur L. Corbin, *Corbin on Contracts* vol. 4, § 959, at 856 (West 1951).

[16] *See also Corbin on Contracts* vol. 4, § 959, at 853 ("a definite and unconditional repudiation ... is a breach of the contract, creating an immediate right of action"); E. Allan Farnsworth, *Farnsworth on Contracts* vol. II, § 8.21, at 535-36 (2d ed., Aspen 1998) (to constitute a repudiation, the statement must be "sufficiently positive to be reasonably understood as meaning that the breach will actually occur"; a party's "expressions of doubt as to its willingness or ability to perform do not constitute a repudiation"). *See also United California Bank v. Prudential Ins. Co.*, 681 P.2d 390, 431 (Ariz.App. 1983) (A mere expression of "disagreement over the terms of a contract is not itself an anticipatory repudiation, nor is a mere offer to perform on terms other

¶105 With these principles in mind, we turn to the parties' arguments.

¶106 First, Fortis takes issue with the fact that the Lorangs seek to hold the company in anticipatory breach of the insurance contract, with respect to the provisions regarding prosthetics coverage, while continuing to treat the rest of the contract as remaining in effect. Fortis argues that the Lorangs are barred from bringing this claim because they allege that the company repudiated only part of its duties under the contract, and Montana law does not recognize an action for "partial anticipatory breach." In support of this argument, Fortis cites *STC, Inc. v. City of Billings*, wherein we stated that a repudiation "must be entire, absolute and unequivocal to support an action for anticipatory breach." *STC*, 168 Mont. at 373, 543 P.2d at 379. Based on this language, Fortis argues that a claim for anticipatory breach may be maintained only where a party repudiates the "entire" contract. The District Court rejected this argument, and we do also.

¶107 Under Fortis' proposed approach, a party to a contract could repudiate its duty under one of several material provisions in the agreement, and yet remain immune from a claim of anticipatory breach because it has not repudiated the entirety of its contractual duties. We conclude that this approach would conflict with the doctrine of anticipatory breach as it has been developed in Montana.

¶108 In addition to the language of *STC, Inc. v. City of Billings* which Fortis cites, that decision also states that a repudiation occurs where the promisor makes "a positive statement . . . that the promisor will not or cannot *substantially* perform his contractual

---

than those contained in the agreement . . . . Otherwise, contracting parties would be constantly appearing in court with anticipatory repudiation claims.").

44

duties." *STC*, 168 Mont. at 374, 543 P.2d at 379 (emphasis added, citation and internal quotation marks omitted). This holding reflects our decision in *McCaull-Dinsmore Co. v. Jackson*, where we recognized that a repudiation may occur when a party renounces "the contract in whole or in part." *McCaull-Dinsmore Co. v. Jackson*, 57 Mont. 555, 560, 189 P. 771, 772 (1920). In that case, the buyer did not repudiate all of its obligations under the contract, but this Court held the buyer's statement that it would not adhere to a specific payment provision in the agreement "amounted to a repudiation of *a material provision* of the contract." *McCaull-Dinsmore*, 57 Mont. at 562, 189 P. at 772 (emphasis added).

¶109 Although our decision in *STC, Inc. v. City of Billings* states that a repudiation "must be entire, absolute and unequivocal to support an action for anticipatory breach," we used the term "entire" there to describe the categorical nature of a statement which constitutes a repudiation. *STC*, 168 Mont. at 373, 543 P.2d at 379. Neither that case nor any of our other decisions indicate, as Fortis contends, that a party must repudiate the "entire" contract in order to commit an anticipatory breach. Thus, we reject Fortis' argument.

¶110 Fortis also argues that it is entitled to summary judgment because its denial letter to the Lorangs in 2002 did not constitute a repudiation of its duty to provide coverage for Bonnie's future replacement sockets. Given the strict criteria for establishing a claim of anticipatory breach, we agree with this argument.

¶111 In response to Bonnie's 2002 claim, Fortis sent the Lorangs a denial letter which states that the policy does not provide coverage for such claims. Standing alone, this

statement does amount to a categorical denial of liability. However, the letter also stated that Fortis would conduct a review of the claim determination upon request. The letter further provided instructions as to how the Lorangs could initiate the review process, and stated that Fortis would notify the Lorangs of the result of the review and explain its reasoning.

¶112 As we have held, anticipatory breach is a repudiation of a contractual duty before the time set for performance, and such breach occurs only where a party makes an absolute and unequivocal statement repudiating its contractual duty. *STC*, 168 Mont. at 370, 373, 543 P.2d at 377, 379. We conclude that Fortis' letter, taken as a whole, does not meet the criteria for repudiation because it is not absolute and unequivocal. By expressly offering to reconsider its determination, Fortis left open the possibility that it would honor its contractual obligation to cover Bonnie's future claims for replacement sockets. Thus, even when viewing the facts in a light most favorable to the Lorangs, *LaTray*, ¶ 15, we conclude that Fortis' letter was equivocal, and it therefore falls short of the unconditional type of statement required to establish a repudiation.[17]

¶113 The Lorangs argue we should consider the evidence that Fortis has denied each of Bonnie's claims for replacement sockets, in 1994, 1996, 1998, 2002, and 2003, and has complied with the contract only after intervention by the Insurance Commissioner or after

---

[17] By contrast, the insurer in *Continental Casualty Co.* did not offer to reconsider its decision to cease paying benefits. The insurer there committed anticipatory breach because its actions sufficiently demonstrated "a *fixed intention* to abandon, renounce, and refuse to perform the contract." *Continental Casualty Co.*, 389 S.W.2d at 568-69 (emphasis added). *See also Group Life & Health Ins. Co. v. Turner*, 620 S.W.2d 670, 673-74 (Tex.Civ.App. 1981) (The insurer repudiated its contractual duty; although initially expressing willingness to reconsider its denial of liability, the insurer thereafter refused to reconsider "and finally told [the claimant] to quit calling because his file was closed.").

being sued. This evidence, the Lorangs argue, demonstrates that Fortis will never voluntarily honor its contractual duty. However, while the Lorangs may be correct in this argument, the evidence of Fortis' continual disregard of its contractual obligations does not change the equivocal nature of the letter it issued in 2002. Whatever can be said of Fortis' prior conduct, the letter it issued in response to Bonnie's claim—even when viewed in a light most favorable to the Lorangs—simply was not an absolute and unequivocal repudiation.

¶114 In summary, the material facts are not in dispute, and therefore summary judgment is the appropriate means of adjudicating the Lorangs' claim of anticipatory breach.[18] *LaTray*, ¶ 14. We conclude that Fortis is entitled to summary judgment because its letter denying Bonnie's 2002 claim does not constitute an absolute and unequivocal repudiation of the company's future contractual obligations regarding replacement sockets. Thus, we hold that the District Court properly denied the Lorangs' motion for partial summary judgment on liability and properly granted Fortis' motion for summary judgment.

¶115 **(4) Did the District Court err in ruling on the cross-motions for summary judgment regarding the Lorangs' three UTPA claims?**

¶116 As noted, the Lorangs brought three UTPA claims and filed a motion for partial summary judgment on liability as to each one. Fortis then filed a cross-motion for summary judgment on each of these claims. The District Court denied the Lorangs'

---

[18] Although the parties dispute whether the denial was a mistake or an intentional act, that issue is not relevant in determining whether Fortis repudiated its contractual duty. *Chamberlin*, 277 Mont. at 204-05, 921 P.2d at 1241 (the intent underlying a party's statement is irrelevant in determining whether the statement constitutes a repudiation) (citation omitted). *See also Farnsworth on Contracts* vol. II, § 8.21, at 539.

47

motion and granted Fortis' motion. Before analyzing these claims, we note that our statutory law provides the insurer with an affirmative defense whereby it may avoid liability in a UTPA action if it "had a reasonable basis in law or in fact for contesting the claim or the amount of the claim, whichever is in issue." Section 33-18-242(5), MCA; *Redies v. Attorneys Liability Prot. Soc.*, 2007 MT 9, ¶ 28, 335 Mont. 233, ¶ 28, 150 P.3d 930, ¶ 28. Here, Fortis does not argue that it had a reasonable basis in law or fact for contesting Bonnie's claim. Additionally, Fortis admits that it breached the insurance contract by denying the claim.

## I. Misrepresentation

¶117 The UTPA prohibits insurers from misrepresenting the coverage provisions of an insurance policy. Section 33-18-201(1), MCA. Where an insurer violates this prohibition, the claimant may bring an independent cause of action to recover actual damages. Section 33-18-242(1), MCA. Additionally, in accordance with the Legislature's express purpose of prohibiting unfair and deceptive claims-adjustment practices, the UTPA provides that punitive damages may be assessed against an insurer for such a misrepresentation. Sections 33-18-101; 33-18-242(4), MCA.

¶118 Here, the Lorangs allege that Fortis misrepresented the insurance policy when, in response to Bonnie's 2002 claim, it issued a letter to the Lorangs stating that the policy does not provide coverage for the cost of replacement sockets. The Lorangs moved for partial summary judgment on liability as to this claim, and Fortis then filed a cross-motion for summary judgment. The District Court considered these motions together and

48

issued an order in which it denied the Lorangs' motion and granted Fortis' motion. On appeal, the Lorangs argue that the court erred in ruling on these cross-motions.

¶119 As we have held, summary judgment is appropriate where there are no genuine disputes as to the facts which are material to a claim. *LaTray*, ¶ 14. Here, neither Fortis nor the Lorangs raise any disputes as to the material facts regarding this claim. Rather, both parties argue that they are entitled to summary judgment based on the application of law to the undisputed facts. Similarly, we perceive no disputes regarding material facts which would preclude summary judgment, and we therefore proceed to the merits of this claim.

¶120 We begin by noting the central factual matters which are undisputed. First, it is undisputed that the Lorangs' policy provides coverage for the cost of medically-necessary replacement sockets. Second, it is undisputed that Fortis stated in its letter to the Lorangs that the policy does not provide such coverage. Third, it is undisputed that Fortis did in fact misrepresent the policy with this letter. The Lorangs argue, quite simply, that these undisputed facts entitle them to partial summary judgment on liability. Fortis disagrees, arguing that further analysis is required.

¶121 While not disputing that it misrepresented the policy, Fortis nonetheless argues that it is entitled to summary judgment because its written statement to the Lorangs does not constitute the specific type of misrepresentation prohibited by the UTPA. In support of this argument, Fortis first contends that "some level of intent to misrepresent is required for a violation of the statute." Thus, Fortis argues that because it did not actually intend to misrepresent the policy, its statement to the Lorangs does not violate the UTPA.

49

Second, Fortis contends that an insurer can "refute" an alleged intent to misrepresent by paying the subject claim after the misrepresentation occurs. Thus, because it ultimately paid Bonnie's 2002 claim, Fortis argues that the Lorangs cannot prevail on this claim even if they could prove an intentional misrepresentation. Third, Fortis contends that an insurer's misrepresentation of policy provisions does not violate the UTPA if the claimant knows the statement is false. Thus, Fortis argues that because the Lorangs knew they were entitled to coverage pursuant to the policy, the statement was not a misrepresentation under the UTPA.

¶122 Upon these contentions, Fortis argues that it is entitled to summary judgment because its statement to the Lorangs does not amount to the specific type of misrepresentation prohibited by the UTPA. As Fortis puts it, the statement at issue is not an "actionable misrepresentation."

¶123 The District Court adopted Fortis' argument that a misrepresentation must be intentional in order to violate the UTPA. The court also agreed that Fortis' conduct after it sent the letter, and after the Lorangs filed this suit, is relevant in determining whether Fortis had misrepresented the policy in violation of the UTPA. Thus, the court held, without any supporting analysis or citation to authority, that because Fortis ultimately paid Bonnie's claim "the evidence refutes any intent of Fortis to misrepresent the policy provisions." Finally, the court held that "any wrong by Fortis was promptly cured."

¶124 Fortis' arguments boil down to a three-part set of rules which Fortis argues should govern claims of misrepresentation under the UTPA: (1) the plaintiff must prove that the insurer intended to misrepresent the policy; (2) the plaintiff cannot demonstrate such

50

intent if the insurer subsequently pays the claim; and, (3) in any event, an insurer's misrepresentation is not actionable under the UTPA if the plaintiff knows of the falsity of the statement. We conclude that these proposed rules conflict with the UTPA's plain language.

¶125 First, with respect to Fortis' argument regarding the issue of intent, we note that the UTPA provision at issue, § 33-18-201(1), MCA, simply states that an insurer may not "misrepresent pertinent facts or insurance policy provisions relating to coverages at issue." This language does not distinguish between intentional and unintentional misrepresentations; rather, it prohibits misrepresentations categorically. Thus, we have never held that a claimant must prove any level of intent in order to demonstrate that the insurer misrepresented the policy. Yet, Fortis would have us "interpret" this language to mean that "some level of intent to misrepresent is required for a violation of the statute." Fortis fails to explain exactly what "level of intent" we should read into the statute. More importantly, however, Fortis cites no authority and provides no justification for its argument.

¶126 In fact, the "interpretation" Fortis argues for is nothing short of an outright revision of the statute. That is, Fortis would have us insert an "intent" element into the statute, thereby immunizing insurers from liability for any misrepresentation which is not proven to have been intentional, and consequently diminishing the protection which the UTPA provides for claimants. We cannot alter the statute in this manner, as "one of the most basic precepts governing this Court's function" is the long-standing mandate that we must not insert into a statute what the Legislature has omitted. *Saucier v.*

51

*McDonald's Restaurants of Montana*, 2008 MT 63, ¶ 70, 342 Mont. 29, ¶ 70, 179 P.3d 481, ¶ 70 (citing § 1-2-101, MCA). Simply put, we have no business meddling with the statute as Fortis advocates.[19]

¶127 Whether the UTPA's prohibition against misrepresentation *should* have an "intent" element is not an issue for us to resolve. The Legislature has resolved that issue with the plain statutory language that categorically prohibits misrepresentations. Pursuant to this plain language, a claim of misrepresentation under the UTPA is determined by an objective analysis of the substance of the representation at issue, without regard to whether it resulted from an intentional effort to mislead, carelessness, incompetence, or anything else. Thus, we reject Fortis' argument that "some level of intent to misrepresent is required for a violation of the statute."[20]

¶128 As noted, Fortis also argues that an insurer can "refute" an alleged intent to misrepresent by paying the subject claim after the misrepresentation occurs. We reject

---

[19] Similarly, in *State v. Hudson*, 2005 MT 142, 327 Mont. 286, 114 P.3d 210, we refused to insert an "intent" element into a statute where the Legislature had omitted such an element. With respect to the statutory law which defines the offense of driving while under the influence of alcohol or drugs, § 61-8-401, MCA, we stated: "the offense of driving while under the influence remains a strict liability offense that does not require an intent element and we will not add one here." *Hudson*, ¶ 15.

[20] With respect to the issue of intent, the Lorangs argue that the misrepresentation here was not a mistake because Fortis denies claims for replacement sockets as a matter of course. We need not address this argument here, as a response to Fortis' argument, because the issue of intent is not relevant in determining whether a misrepresentation occurred. We note, however, that the Lorangs' argument goes to their broader assertion that Fortis' conduct in this case represents its general business practice. That issue is appropriately considered at trial with respect to the Lorangs' claim under § 33-18-201(6), MCA, and their claim that Fortis acted with actual malice (although the Lorangs are not required to prove a general business practice in order to prevail on their UTPA claims, § 33-18-242(2), MCA). For the limited purposes of our summary-judgment analysis here, however, the issues of mistake and general business practice are not relevant in determining whether Fortis misrepresented the policy in 2002.

this argument because an insurer's intent is simply irrelevant under § 33-18-201(1), MCA. Moreover, an insurer's conduct after an alleged misrepresentation does not have any logical connection to the determination of whether a misrepresentation actually occurred. Of course, subsequent conduct may be relevant to the issue of damages, as Fortis argues, particularly where the insurer takes prompt remedial action. However, subsequent conduct cannot change the nature of the previously rendered statement. Indeed, if an insurer could "cure" a misrepresentation as the District Court concluded, insurers could misrepresent at will, turning away untold numbers of claimants, and yet escape liability even when a misrepresentation is discovered, by simply paying the claim it was obligated to pay in the first place. This would render the UTPA's prohibition ineffective. Thus, we reject the notion that an insurer's subsequent conduct has any bearing on the issue of whether it misrepresented the insurance policy.

¶129 Fortis also argues that an insurer's misrepresentation of policy provisions is not an "actionable misrepresentation" if the claimant knows the statement is false. In support of this argument, Fortis asserts that we should treat UTPA claims for misrepresentation, in part, like tort claims for negligent misrepresentation, one element of which is that "the plaintiff must have been unaware of the falsity of the representation." *Osterman v. Sears, Roebuck & Co.*, 2003 MT 327, ¶ 32, 318 Mont. 342, ¶ 32, 80 P.3d 435, ¶ 32. Fortis also supports this argument by asserting that Montana has in some circumstances "adopted the doctrine of 'inquiry notice' to preclude various claims of misrepresentation where the plaintiff had knowledge that put them on notice." Therefore, because the Lorangs knew

of the falsity of Fortis' statement regarding prosthetics coverage, Fortis argues that its misrepresentation of the policy does not violate the UTPA.

¶130 Fortis cites no authority supporting its argument that we should import concepts from these common-law doctrines into the UTPA. It is critical to recognize that a claim for misrepresentation under the UTPA is an independent, statutorily-created cause of action under § 33-18-242(1), MCA, which is distinct from common-law claims of misrepresentation. Moreover, the UTPA is perfectly clear; it categorically prohibits insurers from misrepresenting coverage provisions in an insurance policy. Section 33-18-201(1), MCA. It contains no exception for misrepresentations made to claimants who accurately comprehend the meaning of the policy; rather, it is a protection for *all* claimants, regardless of their level of knowledge regarding the policy. Nor does the UTPA suggest that a "misrepresentation" is to be defined with reference to the claimant's state of mind.

¶131 Pursuant to the UTPA's plain language, a claim of misrepresentation is determined by an objective analysis of the substance of the representation at issue. Thus, because the claimant's knowledge is irrelevant in analyzing the substance of the insurer's statement, it is irrelevant in determining whether the insurer rendered a misrepresentation. Yet, Fortis would have us interpret the UTPA's prohibition against misrepresentations in a way that makes the claimant's knowledge relevant, thereby immunizing insurers from liability for a misrepresentation where the claimant is fortunate enough to recognize the deception. Under Fortis' proposed approach, § 33-18-201(1), MCA, would only prohibit

54

misrepresentations to certain claimants. Adopting this approach would effectively revise the statutory language at issue, and we are not at liberty to do so. Section 1-2-101, MCA.

¶132 The statutory prohibition against misrepresentations reflects the fact that, given the complexity of insurance policies, an insurer can easily mislead even well-informed claimants as to the meaning of policy provisions. Thus, under § 33-18-201(1), MCA, the insurer's duty is simply to be truthful in its representations regarding the coverage provisions of an insurance policy. The claimant's knowledge regarding the policy is utterly irrelevant in determining whether the insurer has violated its duty. Thus, we reject Fortis' argument that an insurer's misrepresentation of policy provisions is not an "actionable misrepresentation" if the claimant knows the statement is false.

¶133 In summary, the material facts are not in dispute, and therefore summary judgment is the appropriate means of adjudicating this claim. *LaTray*, ¶ 14. It is undisputed that Fortis misrepresented the prosthetics provisions of the insurance policy, just as it had done before on several occasions, and we reject Fortis' argument that this was not an "actionable misrepresentation." Thus, we conclude that the Lorangs are entitled to partial summary judgment on liability. Accordingly, we hold that the District Court erred in denying the Lorangs' motion for partial summary judgment and in granting Fortis' motion for summary judgment on this claim.

II. Failure to Conduct a Reasonable Investigation Before Denial

¶134 The UTPA prohibits insurers from denying claims without first "conducting a reasonable investigation based upon all available information." Section 33-18-201(4), MCA. Where an insurer violates this provision, the claimant may bring an independent

cause of action to recover actual damages. Section 33-18-242(1), MCA. Additionally, in accordance with the Legislature's express purpose of prohibiting unfair and deceptive claims-adjustment practices, the UTPA provides that punitive damages may be assessed against an insurer for failing to conduct a reasonable investigation before denying a claim. Sections 33-18-101; 33-18-242(4), MCA.

¶135 Here, the Lorangs allege that Fortis violated the UTPA by failing to conduct a reasonable investigation based on all available information before denying Bonnie's 2002 claim. The Lorangs moved for partial summary judgment on liability as to this claim, and Fortis then filed a cross-motion for summary judgment. The District Court considered these motions together and issued an order in which it denied the Lorangs' motion and granted Fortis' motion. On appeal, the Lorangs argue that the court erred in ruling on these cross-motions.

¶136 As we have held, summary judgment is appropriate where there are no genuine disputes as to the facts which are material to a claim. *LaTray*, ¶ 14. Here, the sole issue is whether Fortis' investigation of Bonnie's 2002 claim was reasonable. Section 33-18-201(4), MCA. Reasonableness is generally a question of fact for the jury to resolve. *See Redies*, ¶ 30 (discussing the factual determination of whether an insurer had a reasonable basis for denying a claim). However, questions of fact may be determined as a matter of law on summary judgment if "reasonable minds could reach but one conclusion" on the issue. *Seeley v. Davis*, 284 Mont. 517, 523, 946 P.2d 119, 122 (1997). *See also Redies*, ¶ 35 ("while the assessment of reasonableness generally is within the province of the jury . . . reasonableness is a question of law for the court to determine

56

when it depends entirely on interpreting relevant legal precedents and evaluating the insurer's proffered defense under those precedents"); *Craig v. Schell*, 1999 MT 40, ¶ 12, 293 Mont. 323, ¶ 12, 975 P.2d 820, ¶ 12 (in a negligence action, breach of duty and causation are factual issues which are ordinarily not susceptible to summary judgment; however, such factual issues are appropriately determined as a matter of law on summary judgment where reasonable minds could reach but one conclusion).

¶137 Here, both Fortis and the Lorangs agree that there are no genuine issues of material fact for a jury to resolve. Both parties contend that the reasonableness of the investigation is appropriately determined as a matter of law. We agree.

¶138 We begin by noting the undisputed facts which are material to this claim. Fortis maintains an extensive file which chronicles its prior dealings with the Lorangs. This file contains a record of each of Bonnie's prior claims for replacement sockets, Fortis' denials of those claims, the Insurance Commissioner's intervention on Bonnie's behalf, and Fortis' ultimate admissions of liability and eventual payment of these claims, among other things. It also contains records regarding the Lorangs' first lawsuit against Fortis and the subsequent settlement.

¶139 These records were readily available to Jeanne Pehoski ("Pehoski"), the Fortis adjuster who handled Bonnie's 2002 claim. Pehoski did not review all these records, but she did locate a note which was placed in the Lorangs' file after the previous lawsuit was

settled. This note states that Bonnie's claims for replacement sockets are not to be denied on the basis that such coverage is not available under the policy.[21]

¶140 Pehoski testified that upon discovering this note she determined Bonnie's claim should be paid, and therefore prepared to take appropriate steps to that end. However, Pehoski also testified that she was then called away from her desk, and consequently forgot her determination that the claim should be paid. When she returned to her desk, Pehoski testified, her thought process was as follows: "I came back, and I was on a completely different wavelength. And I looked at the claim. And I said to myself, well, why was I going to pay that? These are denied. We don't pay these. And I just denied it." At another point in her deposition, Pehoski testified that she did not immediately deny the claim, but proceeded to review a claims manual before issuing the denial. In any event, it is undisputed that, after she forgot the pertinent information, Pehoski ended the investigation without conducting any further review of the Lorangs' records.[22]

¶141 Fortis then admittedly breached the insurance contract when it issued the letter of denial stating that the Lorangs' policy does not provide coverage for the cost of replacement sockets. As noted, the District Court granted partial summary judgment on

---

[21] This language reflects the fact that the Lorangs' policy provides coverage for replacement sockets only when they are medically necessary. Here, as noted, there has never been any dispute as to medical necessity regarding Bonnie's claim. As Dr. Robinson concluded, "[Bonnie] has developed a chronic sore .... Socket replacement is medically necessary to prevent further stump injury and loss of ambulation."

[22] Pehoski's testimony indicating that Fortis regularly denies replacement-socket claims, despite its admissions regarding coverage, touches on the issue of Fortis' general practice which the Lorangs have raised on appeal. However, for the limited purposes of our summary-judgment analysis here, we need not address that issue.

liability in favor of the Lorangs with respect to their claim that Fortis breached the contract by non-performance, and that issue has not been appealed by Fortis.

¶142 Fortis argues that it conducted a reasonable investigation because Pehoski did in fact locate the pertinent information, and the denial was merely a mistake which occurred when she forgot that information. Additionally, Fortis argues that it cannot be held liable under the UTPA because it ultimately paid Bonnie's claim.

¶143 The Lorangs argue that Fortis failed to conduct a reasonable investigation because Pehoski did not conduct any additional review of the Lorangs' records after forgetting the information she initially discovered. Additionally, the Lorangs argue that Fortis cannot utilize a "mistake" defense to avoid liability in this action. Finally, they argue that Fortis' eventual payment of the claim does not "cure" its failure to conduct a reasonable investigation.

¶144 The District Court failed to adequately address the Lorangs' claim. First, the court did not analyze whether there were factual issues which would preclude summary judgment. Second, the court did not determine whether Fortis' investigation was reasonable or unreasonable as a matter of law. Instead, the court addressed a tangential aspect of the parties' arguments, and held that Fortis' wrongful denial does not prove that its investigation was unreasonable. The court then proceeded to state that "any wrong by Fortis was promptly cured." Upon this reasoning, and without citation to any legal authority, the court granted summary judgment in favor of Fortis.

¶145 First, we note Fortis stresses that its denial was a mistake which, as the District Court held, was "cured" by the subsequent payment of Bonnie's claim. However, neither

59

the "mistaken" denial nor Fortis' conduct after the denial are at issue here. Rather, the sole issue in a claim under § 33-18-201(4), MCA, is whether the investigation itself was objectively reasonable.

¶146 We have previously dealt with arguments which failed to recognize this principle. For example, in *Lough v. Insurance Co. of North America*, 242 Mont. 171, 174-75, 789 P.2d 576, 578 (1990), where the plaintiff alleged inter alia that the insurer violated the UTPA by failing to conduct a reasonable investigation, the district court granted summary judgment in favor of the insurer "on the basis that [the plaintiff] failed to establish reasonably clear liability" with respect to the underlying claim. We reversed, stating: "By adopting [the insurer's] argument and affirming the District Court, this Court would be ignoring the plain meaning of the statute and imposing a condition precedent not contemplated by the legislature." *Lough*, 242 Mont. at 173-74, 789 P.2d at 578. We then recited the statutory language which creates an independent cause of action solely for an unreasonable investigation, and stated that such actions simply do not require proof of reasonably clear liability as to the underlying claim. *Lough*, 242 Mont. at 174, 789 P.2d at 578. Thus, our decision acknowledged the plain statutory language which establishes that the nature of the investigation itself is the sole issue in a claim of unreasonable investigation under the UTPA. *Lough*, 242 Mont. at 174, 789 P.2d at 578.

¶147 We also acknowledged this principle in *Walker v. St. Paul Fire & Marine Ins. Co.*, 241 Mont. 256, 258, 786 P.2d 1157, 1159 (1990), another case where the plaintiff alleged, inter alia, that the insurer had violated the UTPA by failing to conduct a

60

reasonable investigation before denying her claim.[23] There, the district court granted summary judgment in favor of the insurer based on its conclusion that a reasonable basis existed for the denial. *Walker*, 241 Mont. at 257-58, 786 P.2d at 1159. We reversed, stating that the district court's conclusion that the insurer had "reasonable grounds [for the denial] as a matter of law *does not address* the issues of material fact" regarding the unreasonable-investigation claim. *Walker*, 241 Mont. at 259, 786 P.2d at 1159 (emphasis added). Again, this decision acknowledged the plain statutory language which establishes that the nature of the investigation itself is the sole issue in a claim of unreasonable investigation under the UTPA. *Walker*, 241 Mont. at 258-59, 786 P.2d at 1159. *See also Peterson*, ¶ 39 (where the plaintiffs alleged, inter alia, that the insurer violated the UTPA by failing to conduct a reasonable investigation, we observed that the issue "was not about the amount of the settlement which [the insurer] paid to the [plaintiffs], but, rather, about the *process* used by [the insurer] *before* entering the settlement") (emphases added).

¶148 Similarly here, whether Fortis' denial was a "mistake" is irrelevant because the denial is not at issue. Rather, as the plain statutory language dictates, the sole issue in

---

[23] Incidentally, we note the *Walker* decision inexplicably states that this Court applies a combined "clearly erroneous" standard and "abuse of discretion" standard in reviewing a summary-judgment order. *Walker*, 241 Mont. at 258, 786 P.2d at 1159 (citing *Walker v. Larson*, 223 Mont. 333, 335, 727 P.2d 1321, 1322-23 (1986), in turn citing no authority). This is incorrect. We apply neither of these standards; rather, we apply de novo review. *LaTray*, ¶ 14; *see also Walker*, 241 Mont. at 259-61, 786 P.2d at 1160-61 (Sheehy, J., specially concurring).

this independent cause of action is whether the investigation itself was objectively reasonable.[24]

¶149 In the same way, the fact that Fortis ultimately paid the claim, after the Lorangs pressed their rights by filing suit, is also irrelevant in determining whether the investigation itself was objectively reasonable. Moreover, if we held that an insurer may "cure" an unreasonable investigation by subsequently paying the claim after a denial, insurers could simply ignore the UTPA and forego reasonable investigation, or any investigation, until the claimant takes steps to enforce his or her contractual rights, and yet remain immune from liability under § 33-18-201(4), MCA. This would effectively render the UTPA's mandate meaningless.

¶150 Most importantly, however, we must acknowledge the plain statutory language which prohibits us from affirming the District Court's determination that Fortis "cured" any shortcomings in its investigation by paying the claim after its wrongful denial. The UTPA mandates a reasonable investigation *before* a denial. Section 33-18-201(4), MCA. Thus, no amount of meritorious conduct *after* the denial (such as thorough investigation or payment of the claim) can satisfy this obligation. Of course, subsequent conduct may be relevant to the issue of damages, particularly where the insurer takes prompt remedial action. However, conduct after the denial cannot operate to satisfy the statutory obligation to conduct a reasonable investigation before denial.

---

[24] The Lorangs argue that the denial was not a mistake because Pehoski ultimately did what she was trained to do—i.e., deny claims for replacement sockets. While this argument is relevant to their claim under § 33-18-201(6), MCA, and the issue of malice, it is not relevant in our analysis here, for the reasons noted above.

¶151 Thus, because the sole issue in an independent cause of action for an unreasonable investigation is whether the investigation itself was objectively reasonable, we hold that both the allegedly mistaken denial and Fortis' ultimate payment are irrelevant in determining liability as to this claim.

¶152 We now turn to the parties' arguments regarding the reasonableness of Fortis' investigation. As noted, it is undisputed that Pehoski began an investigation of the claim, located information conclusively demonstrating Fortis' obligation to pay, and promptly "forgot" that information. It is also undisputed that Pehoski then chose to end the investigation without further review of the Lorangs' records.

¶153 Fortis argues that, as a matter of law, it satisfied the statutory obligation to conduct a reasonable investigation because Pehoski did, at one point, locate the pertinent information. We disagree. Moreover, we find this argument frivolous.

¶154 Simply accessing the pertinent information is not enough to satisfy the statutory mandate; rather, that information must be examined in a reasonable manner. We conclude that the UTPA's "reasonable investigation" mandate requires, at a minimum, that the investigating adjuster examine the pertinent information thoroughly enough to retain it and act upon it, whatever the ultimate determination of the claim may be. After all, the duty of reasonable investigation operates to ensure that the adjuster obtains enough information to make an informed decision. However, an informed decision cannot be made if the pertinent information is forgotten before it can be acted upon. Here, when Pehoski "forgot" the pertinent information initially gleaned from the

Lorangs' file, the failure to continue the investigation was patently unreasonable because, in effect, it was no different than a failure to conduct *any* investigation.

¶155  Of course, Pehoski's location of the pertinent information was a reasonable step in the investigative process. However, reasonable steps taken in the investigative process do not render the investigation ultimately reasonable. Although Pehoski's initial efforts were not unreasonable, and the fact that she "forgot" the pertinent information does not by itself render the investigation unreasonable, Pehoski's subsequent decision to end the investigation without further review of the Lorangs' records—at the time when she was unaware of the pertinent information—renders the investigation unreasonable as a matter of law.

¶156  In summary, the only genuine issue of material fact as to liability in this claim is whether Fortis' investigation was reasonable. We reiterate that the reasonableness of an insurer's investigation is a factual issue which ordinarily must be resolved by the jury. However, where reasonable minds could reach but one conclusion, the issue is appropriately determined as a matter of law on summary judgment. Here, even when the evidence is viewed in a light most favorable to Fortis, we conclude that reasonable minds could reach but one conclusion. Because Pehoski abandoned the investigative process without the benefit of the critical information in Fortis' own records, we conclude no reasonable juror could find that Fortis' investigation was reasonable. Simply put, an insurer's investigation is unreasonable *per se* if the information gleaned therefrom is "forgotten" and the investigation is ended at that point.

¶157 Thus, we conclude that Fortis failed to conduct a reasonable investigation as a matter of law, in violation of § 33-18-201(4), MCA, and the Lorangs are therefore entitled to partial summary judgment on liability. Additionally, as noted above, Fortis' "mistake" defense is not relevant to the issue of liability, and its eventual payment of Bonnie's claim does not "cure" the failure to conduct a reasonable investigation before the denial. Accordingly, we hold that the District Court erred in denying the Lorangs' motion for partial summary judgment on liability and in granting Fortis' motion for summary judgment on this claim.

### III. Failure to Act in Good Faith in Settlement

¶158 The UTPA provides that insurers may not "neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." Section 33-18-201(6), MCA. Where an insurer violates this provision, the claimant may bring an independent cause of action to recover actual damages. Section 33-18-242(1), MCA. Additionally, in accordance with the Legislature's express purpose of prohibiting unfair and deceptive claims-adjustment practices, the UTPA provides that punitive damages may be assessed against an insurer in this independent cause of action. Sections 33-18-101; 33-18-242(4), MCA.

¶159 Here, the Lorangs allege that Fortis violated § 33-18-201(6), MCA, in dealing with Bonnie's 2002 claim. The Lorangs moved for partial summary judgment on liability as to this claim, and Fortis then filed a cross-motion for summary judgment. The District Court considered these motions together and issued an order in which it denied the

Lorangs' motion and granted Fortis' motion. On appeal, the Lorangs argue that the court erred in ruling on these cross-motions.

¶160 Before applying our summary-judgment standards to address this claim on the merits, we address a preliminary argument raised by Fortis.

¶161 Fortis argues that the Lorangs may not maintain this cause of action because the statute on which it is based does not apply to the circumstances at issue here. As noted, the statute provides that insurers may not "neglect to attempt in good faith to effectuate prompt, fair, and equitable *settlements* of claims in which liability has become reasonably clear." Section 33-18-201(6), MCA (emphasis added). Fortis argues that the term "settlements" here refers only to compromise agreements. As Fortis states, "[t]his claim never progressed to a point where the parties had any reason to discuss or negotiate a compromise settlement." Thus, Fortis contends that because it paid Bonnie's claim in full and did not attempt to negotiate a compromise settlement, § 33-18-201(6), MCA, is inapplicable here and the Lorangs therefore cannot maintain a cause of action under this statute. We disagree.

¶162 The UTPA does not define the term "settlements" used in § 33-18-201(6), MCA. However, we have addressed this term in *Ridley v. Guaranty Natl. Ins. Co.*, 286 Mont. 325, 951 P.2d 987 (1997). There, we considered whether the term "settlements" refers only to a "final settlement" of all claims between the parties, or whether it also refers to the payment of individual claims made before the parties enter into a final agreement settling all claims. *Ridley*, 286 Mont. at 333-35, 951 P.2d at 991-93.

66

¶163 The claimant in *Ridley* argued that the statutory obligation to effectuate "settlements" requires payment of individual claims for medical expenses when liability is reasonably clear, regardless of whether a final settlement is or can be reached as to all claims. *Ridley*, 286 Mont. at 333, 951 P.2d at 991. The insurer argued that the UTPA does not require such "piecemeal compensation," and that insurers are entitled to withhold all payment, even if liability is reasonably clear as to initial claims, until a "final settlement" is reached. *Ridley*, 286 Mont. at 333, 951 P.2d at 992.

¶164 In rendering our decision, we noted that none of the definitions proffered on appeal indicated that "settlement" is necessarily a resolution of all claims or disputes between parties. *Ridley*, 286 Mont. at 334, 951 P.2d at 992. We also observed that "the word 'settle' has different legal connotations in different situations: '[T]he term may be employed as meaning to agree, to approve, to arrange, to ascertain, to liquidate, to come to or reach an agreement,' and other things." *Ridley*, 286 Mont. at 334, 951 P.2d at 992 (alteration in original) (citing *Black's Law Dictionary* 1372 (6th ed. West 1990)). Additionally, we stated that the UTPA's "reference to 'settlements,' rather than a 'final settlement,' would suggest that the Montana Legislature anticipated that an insurer may have more than one obligation arise from the same incident." *Ridley*, 286 Mont. at 334, 951 P.2d at 992.

¶165 Ultimately, we concluded that the term "settlements" encompasses both the preliminary payment of individual claims and the final settlement of all claims. *Ridley*, 286 Mont. at 334, 951 P.2d at 992. Thus, we rejected the insurer's argument and held that § 33-18-201(6), MCA, requires insurers to pay claims for medical expenses, prior to

67

a final settlement, when liability is reasonably clear.[25] *Ridley*, 286 Mont. at 334, 951 P.2d at 992.

¶166  Just as we declined in *Ridley* to narrowly interpret "settlements" as meaning only the final settlement of all claims, we also decline to interpret that term here to mean nothing more than compromise agreements. "Settlement" is a term used in many contexts, and it consequently has numerous meanings. *See Black's Law Dictionary* 1404-05 (Bryan A. Garner ed., 8th ed., West 2004) (Among other things, the term means a payment made in a transaction, an agreement to end a dispute or lawsuit, the closing of a real estate transaction, and the execution of an estate by an executor.) (citations omitted). In our jurisprudence, we have never suggested that a compromise agreement is the only type of settlement contemplated by the UTPA's mandate to "effectuate prompt, fair, and equitable settlements." Indeed, it is axiomatic that effectuating an equitable settlement in some cases may require a full payment of the amount demanded rather than payment of some lesser amount pursuant to a compromise.

¶167  Moreover, Fortis' approach would conflict with *Ridley*. As noted, our decision in *Ridley* establishes that the term "settlements" in § 33-18-201(6), MCA, encompasses both the initial payment of individual claims for which liability is reasonably clear, and the final settlement of all claims. *Ridley*, 286 Mont. at 334, 951 P.2d at 992. To now hold

---

[25]  As noted, the claims at issue in *Ridley* were claims for medical expenses. However, our decision expressed a principle which extends beyond the facts of the case. As we stated in *DuBray v. Farmers Ins. Exchange*, 2001 MT 251, ¶ 15, 307 Mont. 134, ¶ 15, 36 P.3d 897, ¶ 15, "[n]othing in *Ridley* suggests that its scope should be categorically limited to medical expenses." Rather, "the principle for which it stands," as we stated, is that "where liability is reasonably clear, injured victims are entitled to payment of those damages which are not reasonably in dispute without first executing a settlement agreement and final release." *Dubray*, ¶¶ 13-14.

that "settlements" refers only to compromise agreements, as Fortis asserts, would simply be incompatible with *Ridley*'s treatment of that term.

¶168 Ultimately, Fortis' approach would establish that § 33-18-201(6), MCA, does not impose a duty to effectuate settlement by full payment when liability is reasonably clear, but only a duty to effectuate settlement by way of a compromise agreement. We conclude there simply is no basis for construing the statute in this manner. Indeed, Fortis cites no authority as to the meaning of the term "settlements," but simply asserts its own interpretation in conclusory fashion. Accordingly, we reject Fortis' argument.

## A. The Lorangs' Motion for Partial Summary Judgment

¶169 We again refer to the pertinent statutory language in order to establish the proper context for our discussion. Section 33-18-201(6), MCA, provides that an insurer may not "neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear." Here, significant facts relevant under this statute are undisputed. First, it is undisputed that Fortis' liability was reasonably clear when Bonnie submitted her 2002 claim. Second, there is no dispute as to whether Fortis' eventual payment of this claim was fair or equitable in terms of the amount paid. Thus, the issue to be resolved here is whether Fortis violated its statutory duty to act in good faith to effectuate prompt settlement. This is a factual issue. *See e.g. Precision Theatrical Effects, Inc. v. United Banks, N.A.*, 2006 MT 236, ¶ 23, 333 Mont. 505, ¶ 23, 143 P.3d 442, ¶ 23; *Simmons v. Jenkins*, 230 Mont. 429, 435, 750 P.2d 1067, 1071 (1988). However, the Lorangs argue that this issue should be determined as a matter of law on summary judgment.

¶170 Specifically, the Lorangs argue that Fortis violated § 33-18-201(6), MCA, as a matter of law because the denial of Bonnie's claim resulted from Fortis' institutionalized scheme of attempting to avoid its contractual obligations with respect to prosthetics coverage. As the Lorangs assert, even if an insured pursues Fortis' internal claims-appeal process, "Fortis' practice is to automatically deny coverage for all replacement socket claims, but to then 'correct' or 'reverse' its denial once an insured files suit or an insurance commissioner's office intervenes on behalf of the insured."

¶171 In support of their argument that this is Fortis' general practice, the Lorangs cite testimony from Fortis' claims adjusters who state that the company regularly denies claims for replacement sockets and even trains its adjusters to do so. The Lorangs also cite the evidence that Fortis initially denied each of Bonnie's claims, in 1994, 1996, 1998, 2002, and 2003, but later admitted its contractual obligation and provided coverage after the Insurance Commissioner intervened on two instances, and after the Lorangs filed suit in another instance. Additionally, the Lorangs point to evidence that Fortis has engaged in this same conduct when dealing with other claimants. They state: "This not only happened repeatedly to Bonnie Lorang, it also has happened to every other insured for which Fortis has produced discovery!"

¶172 While this evidence provides strong support for the Lorangs' argument, we must consider the other admissible evidence as well. Additionally, because the Lorangs are the moving party here, we must view the evidence in a light most favorable to Fortis. *LaTray*, ¶ 15. That is, we must draw any reasonable inferences from the evidence in favor of Fortis, recognizing that a reasonable juror might do the same. *LaTray*, ¶ 15.

70

¶173 While the record contains little evidence favorable to Fortis, it does demonstrate that, as a result of the Lorangs' first lawsuit, Fortis placed a note in the Lorangs' file, ostensibly to ensure that Bonnie's claims would be handled appropriately. This note states that Bonnie's claims for replacement sockets are not to be denied on the basis that such coverage is not available under the policy.[26] This instruction was made readily available in Fortis' computer system, and Fortis' adjuster Jeanne Pehoski did in fact locate this instruction when considering Bonnie's 2002 claim. With respect to Fortis' statutory obligation to act promptly, we note that Fortis ultimately issued payment nearly four months after Bonnie's claim was submitted, and just over two months after it was wrongly denied. Fortis argues that while the claim would have been paid in October if handled properly, it was ultimately paid in December and the delay was not significant.

¶174 In light of all the aforementioned evidence, we cannot agree that the Lorangs are entitled to partial summary judgment on liability. We acknowledge the compelling nature of the evidence which indicates bad faith by Fortis, as well as the relative strength of the Lorangs' argument compared to that of Fortis. However, we have held that if there is any doubt as to the propriety of granting a summary judgment motion, that doubt must be resolved in favor of the party opposing the motion. *Newbury*, ¶ 14; *Krusemark*, 186 Mont. at 177, 606 P.2d at 1084; *Mathews*, 184 Mont. at 379, 603 P.2d at 238. This rule reflects the overriding principle that we must "exercise extreme care" to avoid resolving

[26] As noted, this language reflects the fact that the policy provides coverage for replacement sockets only when they are medically necessary. Again, there has never been any dispute as to medical necessity regarding Bonnie's claim.

factual issues which are properly determined by a jury. *Bowen v. McDonald*, 276 Mont. 193, 199, 915 P.2d 201, 205 (1996) (citation omitted).

¶175 Accordingly, in determining the propriety of summary judgment for the Lorangs, we resolve all doubt in favor of Fortis. Considering Fortis' affirmative effort to ensure that Bonnie's claims would not be wrongly denied after the first lawsuit, as well as Fortis' remedial effort which culminated just over two months after the wrongful denial, and viewing this evidence in a light most favorable to Fortis, *LaTray*, ¶ 15, we cannot conclude as a matter of law that Fortis violated § 33-18-201(6), MCA. Thus, a jury must resolve the factual issue of whether Fortis acted in good faith to effectuate prompt settlement of Bonnie's claim.[27]

¶176 As noted above, the District Court denied the Lorangs' motion for partial summary judgment on liability. In doing so, the court did not discuss the application of summary-judgment rules or provide any analysis, but simply reasoned: "The evidence shows that payment was prompt." We do not condone this cursory approach, nor do we agree with the court's reasoning. However, our practice is to affirm a correct ruling even if it was based on erroneous reasoning. *Collier v. Kincheloe*, 2008 MT 100, ¶ 8, 342 Mont. 314, ¶ 8, 180 P.3d 1157, ¶ 8. Thus, for the reasons noted above, we hold that the court correctly denied the Lorangs' motion for partial summary judgment on liability.

---

[27] We note that although the Lorangs may utilize evidence of Fortis' general practices in supporting their claim under § 33-18-201(6), MCA, and in attempting to prove Fortis' alleged malice, they are not required to prove that Fortis' conduct here constitutes its general practice in order to prevail on this UTPA claim. Section 33-18-242(2), MCA.

## B. Fortis' Motion for Summary Judgment

¶177 Like the Lorangs, Fortis argues that this issue should be determined as a matter of law on summary judgment. Specifically, Fortis argues, without reference to the additional facts of this case, that "when an insurer that has denied a claim immediately accedes to a demand for payment of a claim—without further discussion—it complies with § 201(6) as a matter of law."

¶178 First, we note that Fortis did not "immediately" accede to the Lorangs' demand for payment. Rather, Fortis failed to pay Bonnie's claim for over two months after the initial denial (which was nearly four months after the claim was submitted), even though the company was clearly liable for the payment. Second, we cannot limit our analysis to the fact that Fortis eventually paid Bonnie's claim after the Lorangs pressed their rights. By its express terms, the UTPA requires more than eventual compliance with the insurance contract; it imposes a duty to act in good faith when liability becomes reasonably clear. Section 33-18-201(6), MCA. As we have held, with respect to claims made by an insured (as opposed to a third-party claimant), the insurer's duty to effectuate settlement under § 33-18-201(6), MCA, is a fiduciary duty. *Klaudt v. Flink*, 202 Mont. 247, 250, 658 P.2d 1065, 1066 (1983) (overruled in part on other grounds, superseded in part by § 33-18-242, MCA); *Fode v. Farmers Ins. Exchange*, 221 Mont. 282, 285, 719 P.2d 414, 415-16 (1986) (superseded in part by § 33-18-242, MCA).

¶179 To adopt Fortis' argument, thus making an eventual payment the conclusive factor in determining compliance with § 33-18-201(6), MCA, would render irrelevant any inquiry into whether the insurer acted in good faith during the initial stages of a claim.

73

Thus, an insurer could summarily deny or ignore a claim which it is clearly obligated to pay, thereby utterly disregarding the statutory duty of good faith, and yet escape liability under § 33-18-201(6), MCA, by issuing payment after the claimant takes steps to enforce his or her rights. This would defeat the purpose of the statute, which is to prompt good faith conduct not merely after a wrongful denial when the claimant insists on his or her contractual rights, but when liability becomes reasonably clear. Moreover, this would create a financial incentive for unscrupulous insurers to disregard the duty of good faith during the initial stages of a claim. That is, if we held that eventual payment is sufficient to comply with § 33-18-201(6), MCA, there would be no consequence for bad faith during the initial stages of a claim. In this scenario, an insurer could summarily deny claims which it is clearly obligated to pay, consequently profiting where the claimant does not contest the denial, and yet avoid liability under § 33-18-201(6), MCA, by eventually issuing payment if the claimant does contest the denial.

¶180 We reject Fortis' argument, as it is incompatible with both the letter and the spirit of § 33-18-201(6), MCA. Where an insurer wrongfully denies a claim, subsequent payment of the claim does not establish that the insurer complied with its duty of good faith.

¶181 We must consider all the admissible evidence, not merely the fact that Fortis eventually paid this claim after the Lorangs took steps to enforce their contractual rights. Additionally, because Fortis is the moving party here, we must view the evidence in a light most favorable to the Lorangs. *LaTray*, ¶ 15. That is, we must draw any reasonable

74

inferences from the evidence in favor of the Lorangs, recognizing that a reasonable juror might do the same at trial. *LaTray*, ¶ 15.

¶182 Viewing the evidence in this light, it is clear that Fortis cannot prevail on summary judgment. Indeed, this is clear even without viewing the evidence in a light most favorable to the Lorangs. Based on the parties' prior dealings and the testimony of Fortis' own employees, the denial at issue here is consistent with what appears to be a calculated, systematic effort by Fortis to avoid its contractual obligations. As noted, despite an instruction to the contrary, Fortis' adjuster reverted to what she portrayed as the company's general practice regarding prosthetics claims. Thus, the evidence which tends to suggest that Fortis may have acted in good faith here—including the fact that Fortis issued an instruction to its adjusters regarding proper handling of Bonnie's claims, and the fact that Fortis issued payment of the claim just over two months after the wrongful denial—does not establish the absence of genuine issues of material fact.

¶183 The District Court granted Fortis' motion for summary judgment without discussing the application of summary-judgment rules or providing any analysis. Instead, the court simply reasoned: "The evidence shows that payment was prompt." We do not condone this cursory approach, nor do we agree with the court's reasoning. For the reasons noted above, we conclude that this cause of action must be resolved by a jury. Thus, we hold that the District Court erred in granting Fortis' motion for summary judgment.[28]

---

[28] Fortis also suggests that the District Court correctly ruled on the cross-motions for summary judgment "because Fortis paid the claim during the contractual [sixty-day] reconsideration

## IV. Damages

¶184 Finally, Fortis presents an alternative basis on which it argues that we should affirm the District Court. Fortis argues that it is entitled to summary judgment on all three of the UTPA claims here because the impact of its conduct on the Lorangs "did not rise to the level of compensable damages for emotional distress." Specifically, Fortis argues that the Lorangs have failed to demonstrate that they suffered "severe" emotional distress. In making this argument, Fortis relies on *Renville v. Fredrickson*, 2004 MT 324, 324 Mont. 86, 101 P.3d 773, where we applied the standard enunciated in *Sacco v. High Country Independent Press, Inc.*, 271 Mont. 209, 896 P.2d 411 (1995).

¶185 In *Sacco*, we adopted a standard of proof for independent tort claims of negligent or intentional infliction of emotional distress. *Sacco*, 271 Mont. at 220-39, 896 P.2d at 417-29. Although this Court had previously "characterized emotional distress as an element of damages rather than a distinct cause of action," we recognized in *Sacco* that the interest in freedom from infliction of emotional distress merits independent legal protection by way of a stand-alone cause of action. *Sacco*, 271 Mont. at 230-32, 896 P.2d at 424-25. However, we also recognized that a high standard would be necessary in

---

period." Because Fortis does not develop this argument, we address it only briefly. Of course, Fortis may reserve for itself sixty days or any other period of time in which to "reconsider" a claim. However, Fortis' reconsideration procedure does not displace the statutory duty to act promptly and in good faith when liability becomes reasonably clear. As we have observed in the context of the UTPA, "it is axiomatic that laws established for the benefit of the public cannot be contravened by private contract." *Watters v. Guaranty Natl. Ins. Co.*, 2000 MT 150, ¶ 58, 300 Mont. 91, ¶ 58, 3 P.3d 626, ¶ 58 (citation and internal quotation marks omitted) (overruled in part on other grounds). Where an insurer wrongfully denies a claim with the intent of paying only if the claimant presses his or her rights, it acts in bad faith even if payment is ultimately made within sixty days. That is precisely what the Lorangs allege here. As noted above, whether Fortis complied with its duty of good faith is a factual issue.

order to preclude a flood of such stand-alone actions and to guard against fraudulent claims. *Sacco*, 271 Mont. at 232-33, 237, 896 P.2d at 425, 428. Therefore, we held that a claim for negligent or intentional infliction of emotional distress may be maintained as an independent cause of action only where the plaintiff suffers "serious or severe emotional distress," which we defined as that which is "so severe that no reasonable person could be expected to endure it." *Sacco*, 271 Mont. at 232-34, 237-39, 896 P.2d at 425-26, 428-29 (internal alteration omitted).

¶186 In *Renville*, we applied this standard because the plaintiff brought an independent cause of action for negligent infliction of emotional distress. *Renville*, ¶¶ 7, 10-11. The plaintiff alleged that she suffered "extreme emotional distress" when she was notified of her adult son's death in an automobile accident. *Renville*, ¶¶ 6, 10. Applying the *Sacco* standard, we held that the plaintiff had not presented evidence demonstrating the requisite level of emotional distress necessary to maintain her independent tort claim. *Renville*, ¶ 14.

¶187 In the instant appeal, Fortis argues that, because the Lorangs are claiming damages for emotional distress, the *Sacco* standard applies here just as it did in *Renville*. This argument is incorrect because the Lorangs are not asserting an independent cause of action for negligent infliction of emotional distress as did the plaintiff in *Renville*. We have previously rejected just such an argument in *Vortex Fishing Systems, Inc. v. Foss*, 2001 MT 312, 308 Mont. 8, 38 P.3d 836.

¶188 In *Vortex*, an employee brought a discrimination claim against his employer, pursuant to the Montana Human Rights Act, and alleged emotional distress as one

77

element of damages. *Vortex*, ¶ 10. The employer argued that the employee was required to meet *Sacco*'s "serious or severe" standard in order to recover damages for emotional distress. *Vortex*, ¶ 31. We rejected this argument and affirmed the award of $2,500.00 for emotional-distress damages resulting from the employer's unlawful discrimination. *Vortex*, ¶ 34. In doing so, we acknowledged that *Sacco* establishes a standard which is limited to independent tort claims of negligent or intentional infliction of emotional distress. *Vortex*, ¶ 32. Because the employee had not asserted any such independent claim, but had instead alleged emotional distress as an element of damages resulting from unlawful discrimination, we held that the *Sacco* standard did not apply. *Vortex*, ¶¶ 32, 34.

¶189  Similarly here, the Lorangs have alleged emotional distress as an element of damages resulting from Fortis' UTPA violations. They have not brought an independent, stand-alone tort claim for negligent or intentional infliction of emotional distress, and thus the *Sacco* standard is not applicable in this case. *Vortex*, ¶ 32.

¶190  Fortis' argument fails to recognize the distinction between emotional distress as an element of damages resulting from a UTPA violation, and emotional distress which serves as the basis for an independent cause of action in tort. *Sacco* did not create a standard for establishing emotional distress as an element of damages resulting from a UTPA violation or torts generally. Rather, by its express terms *Sacco* creates a standard of proof solely for independent, stand-alone claims of negligent or intentional infliction of emotional distress. *Sacco*, 271 Mont. at 234, 237, 896 P.2d at 426, 428; *Vortex*, ¶ 32; *Seltzer v. Morton*, 2007 MT 62, ¶ 119 n. 11, 336 Mont. 225, ¶ 119 n. 11, 154 P.3d

78

561, ¶ 119 n. 11 ("*Sacco* does not define the standard for proving emotional distress damages incurred pursuant to torts in general; rather, it defines an element of proof necessary to maintain an independent action for intentional or negligent infliction of emotional distress.").[29]

¶191 In Fortis' view, the *Sacco* standard may be injected into legal doctrines which govern claims other than negligent or intentional infliction of emotional distress. Nothing in *Sacco* supports this approach, and we have rejected just such an argument in *Vortex* because the *Sacco* standard, by its express terms, is limited to independent, stand-alone tort claims for negligent or intentional infliction of emotional distress— claims which we have deliberately sought to restrict by imposing a heightened standard of proof. *Sacco*, 271 Mont. at 232-34, 237, 896 P.2d at 425-26, 428; *Vortex*, ¶ 32; *Seltzer*, ¶ 119 n. 11.

¶192 Finally, Fortis' argument conflicts with the applicable statutory standard. The UTPA provides that, in addition to punitive damages, a claimant may recover the "actual damages" which were proximately caused by a UTPA violation. Section 33-18-242(1), (4), MCA. To inject the *Sacco* standard into the UTPA framework would preclude recovery for actual emotional-distress damages in any case where the claimant cannot prove that his or her emotional distress was "so severe that no reasonable person could be expected to endure it." *Sacco*, 271 Mont. at 234, 239, 896 P.2d at 426, 429 (internal

---

[29] This distinction is recognized by the Montana Pattern Instructions for jury trials, which provide one set of instructions for *Sacco* claims, based on the "serious or severe" standard, and a separate instruction for cases where emotional distress is alleged as an element of damages in claims other than negligent or intentional infliction of emotional distress. M.P.I.2d 25.02, 15.01-03.

79

alteration omitted). That would mean that even substantial emotional-distress damages falling below the "serious or severe" standard would not be compensable, despite clear proof of a UTPA violation. Thus, to impose the *Sacco* standard in UTPA claims would constitute a revision of the "actual damages" standard established by the Legislature. We are not at liberty to revise statutes. Section 1-2-101, MCA; *Saucier*, ¶ 70.

¶193 The Lorangs assert that Fortis' conduct caused them to suffer fears of financial hardship, humiliation, and feelings of betrayal. They also assert that, after having paid their monthly premiums for over a decade, and having engaged in protracted efforts to compel Fortis to provide the coverage it had promised, they were "shocked and sickened at the prospect of having to battle with Fortis again to recover replacement socket benefits."[30]

¶194 Fortis does not dispute that its conduct caused the Lorangs to suffer emotional distress. Rather, Fortis argues that the Lorangs have failed to meet the "serious or severe" standard of *Sacco*—i.e., "so severe that no reasonable person could be expected to endure it." *Sacco*, 271 Mont. at 234, 239, 896 P.2d at 426, 429 (internal alteration omitted). As we have explained, the *Sacco* standard does not apply here because the Lorangs are not asserting an independent tort claim of negligent or intentional infliction of emotional distress. *Sacco*, 271 Mont. at 234, 237, 896 P.2d at 426, 428; *Vortex*, ¶ 32; *Seltzer*, ¶ 119 n. 11. Accordingly, we reject Fortis' argument. The measure of the Lorangs' actual damages is a factual matter for the jury to determine.

---

[30] We note that while the Lorangs correctly argue that *Sacco*'s "serious or severe" standard does not apply here, they also assert that their emotional distress was in fact severe. This will be a matter for the jury to consider in determining the appropriate amount of damages.

# CONCLUSION

¶195 With respect to the issue raised on cross-appeal, Fortis now concedes, in light of the intervening decision by the Ninth Circuit Court of Appeals, that the state District Court has subject-matter jurisdiction over this case. Accordingly, we have not addressed this issue.

¶196 With respect to the evidentiary issue raised by the Lorangs, we hold that the evidence of the parties' dealings prior to the first lawsuit is admissible. With respect to the claim of anticipatory breach of contract, we hold that Fortis is entitled to summary judgment. With respect to the UTPA claim that Fortis misrepresented the policy, we hold that the Lorangs are entitled to partial summary judgment on liability. With respect to the UTPA claim that Fortis failed to conduct a reasonable investigation before denying Bonnie's claim, we hold that the Lorangs are entitled to partial summary judgment on liability. Finally, with respect to the UTPA claim that Fortis failed to act in good faith to effectuate prompt settlement, we hold that neither party is entitled to summary judgment.

¶197 Accordingly, we affirm in part, reverse in part, and remand for further proceedings.

_____
Justice

We Concur:

_____
Chief Justice

81

_John Warner_

_Patricia Potter_

_Jim Rice_

Justices